STATE of Wisconsin EX REL. ANGELA M.W., Petitioner-
Petitioner,

v.

William KRUZICKI, Sheriff of Waukesha County,
Rexford W. Titus, III, President, Waukesha Memorial
Hospital, Fred Syrjanen, Director, Lawrence Center &
Director Of Chemical Dependency At Waukesha
Memorial Hospital, Circuit Court for Waukesha
County, The Honorable Kathryn W. Foster, Waukesha
County Corporation Counsel, Thomas Farley and
Assistant Corporation Counsel William Domina,
Respondents-Respondents.†

Supreme Court

*No. 95–2480–W. Oral argument October 30, 1996.—Decided
April 22, 1997.*

(Also reported in 561 N.W.2d 729.)

†Motion for reconsideration denied June 3, 1997.

For the petitioner-petitioner there were briefs by *Robin Shellow, Angela Conrad Kachelski* and *Law Offices of Robin Shellow*; *Peter Koneazny* and *American Civil Liberties Union of Wisconsin Foundation*, both of Milwaukee and *Mary Wyckoff* and *American Civil Liberties Union*, New York, NY and oral argument by

*Angela Conrad Kachelski* and *Sara Mandelbaum* of the *ACLU's Womens Rights Project.*

For the respondents-respondents there was a brief by *William J. Domina, Margaret M. Zimmer* and *Waukesha County Assistant Corporation Counsel*, Waukesha and oral argument by *William J. Domina* and *Jill C. Vento.*

Guardian ad Litem brief was filed by *Jill C. Vento* and *Brenner, Brenner & Wall*, Waukesha.

Amicus curiae was filed by *Carol E. Stauder, John M. Stoiber, Thomas L. Potter*, assistant district attorneys and *E. Michael McCann*, district attorney, Milwaukee.

Amicus curiae was filed by *Stephen W. Hayes, Timothy W. Feeley, Susan E. Lovern* and *Von Briesen, Purtell & Roper, S.C.*, Milwaukee for the National Association of Counsel for Children.

Amicus curiae was filed by *Keith A. Fournier, Jeffrey A. Brauch* and *The American Center for Law & Justice*, Virginia Beach, VA and *Thomas Patrick Monaghan* and *New Hope Life Center\The American Center for Law & Justice*, New Hope, KY, for the New Hope Life Center and The American Center for Law & Justice.

Amicus curiae was filed by *Michael H. Schaalman* and *Quarles & Brady*, Milwaukee; *Carol Tracy, Susan Frietsche* and *Women's Law Project*, Philadelphia, PA; *Lynn Paltrow, Nancy Stearns* and *Center for Reproductive Law & Policy*, New York, NY; *Nadine Taub* and *Women's Rights Litigation Clinic*, Newark, NJ, for the American Public Health Association, The Drug Policy Foundation, The National Black Women's Health Project, The National Center for Youth Law, The National Latina Health Project, The National Women's Health Network, The Northwest Women's Law Center, The

115

NOW Legal Defense and Education Fund, Planned Parenthood of Wisconsin, Inc., The Wisconsin Council on Children and Families and The Wisconsin Women's Network.

¶ 1. ANN WALSH BRADLEY, J. The petitioner, Angela M.W., seeks review of a court of appeals' decision[1] denying her request for either a writ of habeas corpus or a supervisory writ to prohibit the Waukesha County Circuit Court, Kathryn W. Foster, Judge, from continuing to exercise jurisdiction in a CHIPS (child alleged to be in need of protection or services) proceeding. She maintains that the CHIPS statute does not confer jurisdiction over her or her viable fetus. In the alternative, if the CHIPS statute does confer such jurisdiction, the petitioner contends that as applied to her, it violates her equal protection and due process rights. Because we determine that the legislature did not intend to include a fetus within the Children's Code definition of "child," we reverse the decision of the court of appeals.

¶ 2. Although we visit in the facts of this case the daunting social problem of drug use during pregnancy, the essence of this case is one of statutory construction. The relevant facts are undisputed.

¶ 3. The petitioner was an adult carrying a viable fetus with a projected delivery date of October 4, 1995. Based upon observations made while providing the petitioner with prenatal care, her obstetrician suspected that she was using cocaine or other drugs. Blood tests performed on May 31, June 26, and July 21, 1995,

---

[1] *State ex rel. Angela M.W. v. Kruzicki*, 197 Wis. 2d 532, 541 N.W.2d 482 (Ct. App. 1995).

confirmed the obstetrician's suspicion that the petitioner was using cocaine or other drugs.

¶ 4. On July 21, 1995, the obstetrician confronted the petitioner about her drug use and its effect on her viable fetus. The petitioner expressed remorse, but declined the obstetrician's advice to seek treatment. On August 15, 1995, a blood test again confirmed that the petitioner was ingesting cocaine or other drugs. Afterward, the petitioner canceled a scheduled August 28, 1995, appointment, and rescheduled the appointment for September 1, 1995. When she failed to keep the September 1 appointment, her obstetrician reported his concerns to Waukesha County authorities.

¶ 5. On September 5, 1995, the Waukesha County Department of Health and Human Services (the County) filed a "MOTION TO TAKE AN UNBORN CHILD INTO CUSTODY," pursuant to Wis. Stat. § 48.19(1)(c) (1993–94).[2] The caption read "In the Matter of: JOHN OR JANE DOE, A 36 Week Old Unborn Child." In its motion, the County requested an order "removing the above-named unborn child from his or her present custody, and placing the unborn child" in protective custody. The motion was supported by the affidavit of the petitioner's obstetrician, which set out the obstetrician's observations and medical opinion that "without intervention forcing [the petitioner] to

---

[2] Unless otherwise indicated, all future statutory references are to the 1993–94 volume. Wis. Stat. § 48.19(1)(c) provides:

**48.19 Taking a child into custody. (1)** A child may be taken into custody under any of the following:

. . . .

(c) An order of the judge if made upon a showing satisfactory to the judge that the welfare of the child demands that the child be immediately removed from his or her present custody. The order shall specify that the child be held in custody under s. 48.207.

cease her drug use," her fetus would suffer serious physical harm.

¶ 6. In an order filed on September 6, 1995, the juvenile court directed that:

> the [petitioner's] unborn child. . .be detained under Section 48.207(1)(g), Wis. Stats., by the Waukesha County Sheriff's Department and transported to Waukesha Memorial Hospital for inpatient treatment and protection. Such detention will by necessity result in the detention of the unborn child's mother. . . .

¶ 7. Later that same day, before the protective custody order was executed, the petitioner presented herself voluntarily at an inpatient drug treatment facility. As a result, the juvenile court amended its order to provide that detention would be at the inpatient facility. The court further ordered that if the petitioner attempted to leave the inpatient facility or did not participate in the facility's drug treatment program, then both she and the fetus were to be detained and transported to Waukesha Memorial Hospital.

¶ 8. Also on September 6, 1995, the County filed a CHIPS petition in the juvenile court, alleging that the petitioner's viable fetus was in need of protection or services because the petitioner "neglect[ed], refuse[d] or [was] unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child, pursuant to Section 48.13(10) of the Wisconsin Statutes."[3] The County alleged that the petitioner's 36-week-old viable fetus had been exposed

---

[3] Wis. Stat. § 48.13(10) provides:

**48.13 Jurisdiction over children alleged to be in need of protection or services.** The court has exclusive original jurisdic-

to drugs prenatally through the mother's drug use. Instead of a birth date, the petition stated "Due Date 10/4/95." In the space designated for indicating the sex of the subject child, the petition stated "Unknown."

¶ 9. On September 7 and 8, 1995, the juvenile court held detention hearings pursuant to § 48.21(1).[4] At the first hearing, the petitioner appeared by telephone, but without counsel. At the second hearing, now represented by counsel, she appeared again by telephone, and objected to the juvenile court's exercise of jurisdiction. The juvenile court rejected her jurisdictional challenge, and scheduled a plea hearing on the CHIPS petition for September 13, 1995.

¶ 10. On September 13, 1995, the petitioner commenced an original action in the court of appeals, seeking a writ of habeas corpus, or, in the alternative, a supervisory writ staying all proceedings in the juvenile court and dismissing the CHIPS petition. In support of her request, the petitioner asserted that Chapter 48 does not vest the juvenile court with jurisdiction over

___

tion over a child alleged to be in need of protection or services which can be ordered by the court, and:

. . . .

(10) Whose parent, guardian or legal custodian neglects, refuses or is unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to seriously endanger the physical health of the child. . . .

[4] Wis. Stat. § 48.21(1) provides:

**48.21 Hearing for child in custody. (1)** HEARING; WHEN HELD. (a) If a child who has been taken into custody is not released under s. 48.20, a hearing to determine whether the child shall continue to be held in custody under the criteria of ss. 48.205 to 48.209 shall be conducted by the judge or juvenile court commissioner within 24 hours of the time the decision to hold the child was made. . .

.

her or her viable fetus. Alternatively, if the statute does grant such authority, the petitioner argued that it violates the constitutional guarantees of procedural and substantive due process, as well as equal protection of the laws.

¶ 11. The court of appeals declined to stay the juvenile court proceedings, and issued an order on September 21, 1995, denying both writ petitions. The petitioner gave birth to a baby boy on September 28, 1995. Subsequently, the court of appeals issued an opinion supplementing its earlier order.

¶ 12. A divided court of appeals determined that the juvenile court did not exceed its jurisdiction in this case. *State ex rel. Angela M.W. v. Kruzicki*, 197 Wis. 2d 532, 541 N.W.2d 482 (Ct. App. 1995).[5] The court reasoned that the United States Supreme Court, the Wisconsin legislature, and this court have each articulated public policy considerations supporting the conclusion that a viable fetus is a "person" within the meaning of the CHIPS statute's definition of "child." The court also held that application of the CHIPS statute to the petitioner did not deprive her of equal protection or due process, since the statute was a properly tailored means of vindicating the State's compelling interest in the health, safety, and welfare of a viable fetus. The petitioner then sought review in this court, raising substantially the same arguments she raised before the court of appeals.[6]

---

[5] Judge Nettesheim authored the court of appeals' decision and was joined by Judge Brown. Judge Anderson dissented.

[6] Because the petitioner has given birth and is no longer being detained, this action is moot. However, we will retain an otherwise moot case for determination in certain circumstances. For example, we have recognized an exception to the general rule of dismissal for mootness when the issues presented are of

¶ 13. We stress at the outset of our analysis that this case is not about the propriety or morality of the petitioner's conduct. It is also not about her constitutional right to reproductive choice guaranteed under *Roe v. Wade*, 410 U.S. 113 (1973). Rather, this case is one of statutory construction. The issue presented is whether a viable fetus is included in the definition of "child" provided in Wis. Stat. § 48.02(2).

¶ 14. The interpretation of a statute presents a question of law which this court reviews under a *de novo* standard. *Stockbridge School Dist. v. DPI*, 202 Wis. 2d 214, 219, 550 N.W.2d 96 (1996). Our primary purpose when interpreting a statute is to give effect to the legislature's intent. We first look to the language of the statute, and if the language is clear and unambiguous, we define the language of the statute in accordance with its ordinary meaning. If the language of the statute is ambiguous and does not clearly set forth the legislative intent, we will construe the statute so as to ascertain and carry out the legislative intent. In construing an ambiguous statute, we examine the history, context, subject matter, scope, and object of the statute. *Id.* at 220 (*citing Jungbluth v. Hometown, Inc.*, 201 Wis. 2d 320, 327, 548 N.W.2d 519 (1996)).

¶ 15. The statutory language at issue confers on the juvenile court "exclusive original jurisdiction over a

---

great public importance, or the question is capable and likely of repetition and yet evades appellate review because the appellate process usually cannot be completed in time to have a practical effect on the parties. *See Lenz v. L.E. Phillips Career Dev. Ctr.*, 167 Wis. 2d 53, 67, 482 N.W.2d 60 (1992); *G.S. v. State*, 118 Wis. 2d 803, 805, 348 N.W.2d 181 (1984). Because this case satisfies both of the cited mootness exceptions, we proceed to a consideration of the issues presented.

child alleged to be in need of protection or services which can be ordered by the court. . . ." § 48.13. A "child" is defined in Chapter 48 as "a person who is less than 18 years of age." § 48.02(2). The petitioner contends that the Chapter 48 definition of "child" is clear on its face, and mandates the conclusion that Chapter 48 uses the term "child" to mean a person born alive. In support, she asserts that by having no "age," a fetus cannot be a person who is less than 18 years of age.[7] The petitioner submits that it is therefore unnecessary for this court to construe the statute to determine its meaning. In contrast, the County asserts that courts in this State and other jurisdictions have determined that "child" and "person" are ambiguous terms. As such, the County contends that we are required to look beyond the language of the statute for the meaning of "child."

¶ 16. Statutory language is ambiguous if reasonable minds could differ as to its meaning. *Harnischfeger Corp. v. LIRC*, 196 Wis. 2d 650, 662, 539 N.W.2d 98 (1995). While the parties' differing interpretations of a statute do not alone create ambiguity, equally sensible interpretations of a term by different authorities are indicative of the term's ability to support more than one meaning. *Id.*

¶ 17. Case law reveals that different courts have given different meanings to the terms "person" and

---

[7] As further support for her assertion regarding ambiguity, the petitioner notes that a CHIPS petition must include the subject child's date of birth, § 48.255(1)(a), and that other provisions of Chapter 48 indicate that the term "child" was not intended to include a fetus. However, we decline to consider other Chapter 48 provisions until after we have determined that the definition of "child" provided in § 48.02(2) is ambiguous.

"child." This court has previously held that a viable fetus is a "person" for purposes of Wisconsin's wrongful death statute. *Kwaterski v. State Farm Mut. Automobile Ins. Co.*, 34 Wis. 2d 14, 22, 148 N.W.2d 107 (1967). On the other hand, the United States Supreme Court has concluded that a fetus is not a "person" under the Fourteenth Amendment to the United States Constitution. *Roe*, 410 U.S. at 158. Perhaps most compelling, courts in other states have arrived at different interpretations of statutory language nearly identical to that in § 48.02(2). *Compare State v. Gray*, 584 N.E.2d 710, 713 (Ohio 1992) (holding that a third trimester fetus is not "a child under eighteen years of age," as provided in Ohio's child endangerment statute), *with Whitner v. State*, No. 24468, 1996 WL 393164, at *3 (S.C. July 15, 1996) (concluding that a viable fetus is a "person under the age of eighteen," pursuant to South Carolina's child abuse and endangerment statute). Against this backdrop of conflicting authority, we conclude that the term "child" is ambiguous.

¶ 18. In construing the statute, we turn first to the legislative history. Chapter 48 came into existence in 1919 as part of a consolidation and revision of statutory provisions dealing generally with neglected, dependent, or delinquent children. § 2, ch. 614, Laws of 1919. The legislation defined a dependent or neglected child as "any child under the age of sixteen" meeting certain criteria. Wis. Stat. § 48.01(1)(a) (1919). Twenty years later, the definitions were amended to raise the age limit to eighteen years. § 2, ch. 524, Laws of 1939. In 1955, the legislature created a separate subsection for definitions, describing a child as "a person under 18 years of age." § 7, ch. 575, Laws of 1955. In 1977, the legislature created § 48.02(2), which defined a child as a "person who is less than 18 years of age." § 5, ch. 354,

Laws of 1977. Finally, substantial changes made to Chapter 48 in the last legislative session have left the definition of "child" unaltered for purposes of our analysis. 1995 Wis. Act 27, § 2424; 1995 Wis. Act 77, § 44; 1995 Wis. Act 275; 1995 Wis. Act 352, § 10p; 1995 Wis. Act 448.[8]

¶ 19. In examining the legislative history, we find the drafting files of the more recent amendments to the Code devoid of information which might illuminate our search. We also find no news accounts of debate, dialogue, or even consideration of whether fetus should be included in the definition of "child" in Chapter 48. Furthermore, the parties offer no specific historical references to support their respective positions. The issue of whether the Chapter 48 definition of "child" includes a fetus is one of a controversial and complex nature. One would expect heated dialogue and intense debate if the legislature intended to include fetus within the definition of "child." Yet, we are met with legislative silence.

¶ 20. The dissent maintains that the legislature has impliedly ratified the court of appeals' interpretation of § 48.02(2), because amendments to the Code in the months since the court of appeals' decision have left undisturbed the language at issue. Dissent at 150–52. However, the very cases relied upon by the dissent demonstrate the fundamental error of applying the doctrine of legislative acquiescence to the present case.

---

[8] These acts amended the definition of "child" to read:

"Child" means a person who is less than 18 years of age, except that for purposes of investigating or prosecuting a person who is alleged to have violated a state or federal criminal law or any civil law or municipal ordinance, "child" does not include a person who has attained 17 years of age.

¶ 21. The application of the doctrine of legislative acquiescence is justified when the legislature can be "presumed to know that in absence of its changing the law, the construction put upon it by the courts will remain unchanged." *Reiter v. Dyken*, 95 Wis. 2d 461, 471, 290 N.W.2d 510 (1980) (quoting *Zimmerman v. Wisconsin Elec. Power Co.*, 38 Wis. 2d 626, 633–34, 157 N.W.2d 648 (1968)). Of course, if this court has accepted review of a court of appeals' decision construing a statute, the legislature cannot be presumed to know that the court of appeals' interpretation "will remain unchanged." Our acceptance of review makes clear that the construction given to a statute by the court of appeals is subject to change. Thus, the doctrine presupposes the existence of a decision which, unlike the instant court of appeals' decision, is not subject to further appellate review.

¶ 22. This principle is confirmed by reviewing those cases cited by the dissent in which this court found implied legislative ratification of a prior decision. We observe that in each case, the legislature acquiesced to a prior decision that was either unappealable or no longer subject to review. *See State v. Johnson*, 207 Wis. 2d 240, 247, 558 N.W.2d 375 (1997) (finding legislative acquiescence to *Moore v. State*, 55 Wis. 2d 1, 197 N.W.2d 820 (1972)); *State v. Eichman*, 155 Wis. 2d 552, 566, 456 N.W.2d 143 (1990) (citing *State v. Harris*, 123 Wis. 2d 231, 365 N.W.2d 105 (Ct. App. 1985), and *State v. Wild*, 146 Wis. 2d 18, 429 N.W.2d 922 (Ct. App. 1988)); *Reiter*, 95 Wis. 2d at 470–72, 290 N.W.2d 510 (1980) (citing *Schwenn v. Loraine Hotel Co.*, 14 Wis. 2d 601, 111 N.W.2d 495 (1961)); *Milwaukee Fed'n of Teachers, Local No. 252 v. Wisconsin Employment Relations Comm'n*, 83 Wis. 2d 588, 600–1, 266 N.W.2d

314 (1978) (citing *Board of Sch. Dirs. of Milwaukee v. WERC*, 42 Wis. 2d 637, 168 N.W.2d 92 (1969)); *Zimmerman*, 38 Wis. 2d at 632–634 (citing *McGonigle v. Gryphan*, 201 Wis. 269, 229 N.W. 81 (1930), and *Quante v. Erickson*, 2 Wis. 2d 527, 87 N.W.2d 249 (1958)).

¶ 23. In this case, the petitioner filed a timely petition for review of the court of appeals' decision, and we granted review on January 23, 1996. The purported acts of legislative acquiescence occurred after that date. The dissent fails to explain how the legislature can be presumed to possess advance knowledge that the court of appeals' construction of § 48.02(2) would "remain unchanged" upon review by this court. The obvious answer is that the legislature made the amendments to the Code with full knowledge that the court of appeals' construction of § 48.02(2) was subject to alteration on further review by this court. Thus, there was no unappealable decision to which the legislature could acquiesce.[9]

---

[9] If the dissent's conception of legislative acquiescence were correct, it would follow that this court's review of court of appeals' cases involving construction of a statute would be severely restricted. Under the dissent's reasoning, if the legislature has amended statutory language even tangentially related to the text at issue in a given case, and has not disturbed the court of appeals' decision, we should find legislative acquiescence to the court of appeals' decision. Thus, this court's independent determination of legislative intent would be limited by an inference drawn from a lack of legislative reaction to a court of appeals' decision in the very case before us. We reject such a restriction on our direct review of a court of appeals' decision.

¶ 24. We turn next to a consideration of context, examining the § 48.02(2) definition of "child" in conjunction with other relevant sections of the Code. When attempting to ascertain the meaning of statutory language, we are obligated to avoid a construction which would result in an absurdity. *Jungbluth*, 201 Wis. 2d at 327. With this in mind, we note that certain relevant sections of the Code would be rendered absurd if "child" is understood to include a viable fetus. For example, in this case, the initial order taking the fetus into custody was issued pursuant to § 48.19(1)(c). That statute allows a child to be taken into custody by judicial order "upon a showing satisfactory to the judge that the welfare of the child demands that the child be immediately *removed from his or her present custody*." [Emphasis added.] It is obviously inappropriate to apply this language to a viable fetus in utero.

¶ 25. Section § 48.19(2) requires the person taking a child into physical custody to immediately notify the parent by the most practical means. Yet, a pregnant woman would never need notification that her fetus had been taken into "physical custody," for she would already have such notice by virtue of the concomitant circumstance of her own detention.

¶ 26. Section 48.20(2) requires a person taking a child into custody to make every effort to immediately release the child to its parent. This language assumes that the child is at some point removed from the parent. Again, it is axiomatic that a viable fetus in utero cannot be removed from a pregnant woman in the sense conveyed by the statute.

¶ 27. By reading the definition of "child" in context with other relevant sections of Chapter 48, we find a compelling basis for concluding that the legislature

intended a "child" to mean a human being born alive. Code provisions dealing with taking a child into custody, providing parental notification, and releasing a child from custody would require absurd results if the § 48.02(2) definition of "child" included a fetus. Each of the provisions addresses a critical juncture in a CHIPS proceeding. Yet, each also anticipates that the "child" can at some point be removed from the presence of the parent. It is manifest that the separation envisioned by the statute cannot be achieved in the context of a pregnant woman and her fetus.[10]

¶ 28. The court of appeals determined, and the County asserts, that some prior decisions of this court support the proposition that a fetus is a child under the Children's Code. For example, the court of appeals analogized the present case to those in which this court has recognized a degree of fetal personhood under tort law. In support of its analogy, the court of appeals cited our holding in *Kwaterski* that "an eighth-month, viable unborn child, whose later stillbirth is caused by the wrongful act of another, is 'a person' within the meaning of [the wrongful death statute] so as to give rise to a wrongful-death action by the parents of the stillborn infant." *Kwaterski*, 34 Wis. 2d at 15.

¶ 29. The court of appeals also reasoned that because the CHIPS statute is remedial in nature, its

---

[10] The dissent asserts that interpreting "child" to not include a fetus is to work an absurd result, "by rendering the state's power to protect a child dependent upon whether the child is inside or outside of the womb." Dissent at 147. This argument employs a circular method of reasoning, which may be summarized as follows: the legislature intended the term "child" to include a viable fetus because the State must have the power to protect children. We decline to consider an argument that assumes the result.

use of "person" should be liberally construed to include a fetus so as to effectuate the statute's purpose of protecting children. *Angela M.W.*, 197 Wis. 2d 558–59 (*citing Kwaterski*, 34 Wis. 2d at 21). It also noted that in the earlier case of *Puhl v. Milwaukee Auto Ins. Co.*, 8 Wis. 2d 343, 99 N.W.2d 163 (1959), *overruled on other grounds by Stromsted v. St. Michael Hosp.*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980), this court recognized a cause of action of an infant for injuries sustained before birth. In construing "child" to include a fetus, the court of appeals relied heavily on our statement in *Puhl* that " [i]f the common law has any vitality, . . .it should be elastic enough to adapt itself to current medical and scientific truths so as to function as an efficient rule of conduct in our modern, complex society." *Id.* at 357.

¶ 30. Initially, we note that this court has historically been wary of expanding the scope of the Children's Code by reading into it language not expressly mentioned within the text of Chapter 48.[11] While Chapter 48 is to be liberally construed, § 48.01(2), we will not discern from the statute a legislative intent that is not evident. *Green County Dep't of Human Servs. v. H.N.*, 162 Wis. 2d 635, 652, 469 N.W.2d 845 (1991). Furthermore, a directive to construe the statute liberally to effectuate its purpose does not give license to liberally expand the definition of "child" to the stages before birth or after the age of 18.

---

[11] *See, e.g., Green County Dep't of Human Servs. v. H.N.*, 162 Wis. 2d 635, 645–46, 469 N.W.2d 845 (1991) (noting that Chapter 48 is a "carefully drawn legislative enactment which circumscribes judicial and administrative action in juvenile matters"); *Breier v. E.C.*, 130 Wis. 2d 376, 390, 387 N.W.2d 72 (1986) ("The Children's Code. . .does not confer unfettered discretion to craft unique and unspecified remedies in juvenile matters").

The directive is to liberally construe the statute to effectuate its purpose of providing for the care, protection, and development of children. *See* § 48.01(1)(b), (2). The logical extension of the dissent's argument regarding liberal construction would expand the definition of "child" to the moment after conception. No party in this case is advancing such a far-reaching argument. Finally, our decisions placing limited legal duties upon a third person should not be read to confer full legal status upon a fetus. Each must be examined to identify the particular rights and policies underlying the law that is being addressed.

¶ 31. We find the tort law analogy unpersuasive in this context. Instead, we agree with the United States Supreme Court that declaring a fetus a person for purposes of the wrongful death statute does no more than vindicate the interest of parents in the potential life that a fetus represents. *See Roe*, 410 U.S. at 162.[12] Indeed, we have recognized that until born, a fetus has no cause of action for fetal injury:

> Injuries suffered before birth impose a conditional liability on the tort-feasor. This liability becomes unconditional, or complete, upon the birth of the injured separate entity as a legal person. If such personality is not achieved, there would be no liability [to the fetus] because of no damage to a legal person.

---

[12] We disagree with the court of appeals' invocation of *Roe v. Wade*, 410 U.S. 113 (1973), and its progeny. Much of the court of appeals' discussion of *Roe* is devoted to establishing that the State has a compelling interest in the well-being of a viable fetus, and may act to protect that interest. Although the State may have the power to act, the existence of such power sheds no light on the question of whether our legislature has in fact so acted.

*Puhl*, 8 Wis. 2d at 356.[13] For these reasons, we agree with the court of appeals' dissent that our tort law jurisprudence dealing with fetal injury has limited applicability to the present case.

¶ 32. Similarly, we reject the County's argument that the protections accorded fetuses by property law have a bearing on the Children's Code definition of "child." As the dissent below noted, "[P]roperty law does not confer the full rights of personhood upon the fetus. Instead, it creates a means of fulfilling the intentions of testators by protecting the right of a fetus to inherit property upon live birth." *Angela M.W.*, 197 Wis. 2d at 576 n.1 [citations omitted]. When there is no live birth, there is no inheritance right.

¶ 33. We also find unpersuasive the court of appeals' citation to *State v. Black*, 188 Wis. 2d 639, 526 N.W.2d 132 (1994). In *Black*, we held that the defendant was properly charged with feticide, "intentionally destroy[ing] the life of an unborn quick child." Wis. Stat. § 940.04(2)(a). As we noted in that case, "the words of the statute could hardly be clearer." *Black*, 188 Wis. 2d at 642. Unlike § 48.02(2), the language of § 940.04(2)(a) expressly references an "unborn quick child." In the present case, we lack any language approaching the unequivocal legislative statement contained in § 940.04(2)(a). While the *Black* court con-

---

[13]*See also* Lawrence J. Nelson, Brian P. Buggy, and Carol J. Weil, *Forced Medical Treatment of Pregnant Women: Compelling Each to Live as Seems Good to the Rest*, 37 Hastings L.J. 703, 733 (May 1986) ("Judicial recognition of a live-born child's right to recover damages for tortious prenatal injury does not mean that courts recognize unborn fetuses as persons with full legal rights. Instead, this practice focuses on the need for compensation of a living person wrongfully injured rather than on the legal status of the fetus.").

cluded that the legislature has acted to protect a viable fetus in § 940.04(2)(a), that case offers little to aid us in construing the term "child" in the Children's Code.

¶ 34. *Black* demonstrates the ease and clarity with which the legislature may, if it so chooses, apply a statute to the unborn. In its several amendments to the Children's Code, the legislature has had ample opportunity to state in similarly clear and unambiguous terms that a fetus is a child. Yet, the legislature has failed to take such action.

¶ 35. We disagree with the dissent's assertion that *L.K. v. B.B.*, 113 Wis. 2d 429, 335 N.W.2d 846 (1983) ("*In re Baby Girl K.*"), has any relevance to this case. According to the dissent, this court held and determined in *L.K.* that the word "child" as used in Wis. Stat. § 48.415(6)(b) (1981–82) includes a fetus. Dissent at 140, n.3, 144, 147. Our reading of *L.K.* finds no language supporting the statements of law attributed to that case by the dissent.

¶ 36. The *L.K.* court held that a father's parental rights may be terminated based upon his conduct during the mother's pregnancy. The court reached that determination based upon its interpretation of § 48.415(6)(b) (1981–82), which provided in part:

> In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has ever expressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy. . . .[14]

---

[14] According to the dissent, the phrase "child or the mother during her pregnancy" exists as proof that the legislature intended the word "child" to include a fetus for purposes of Chapter 48. Dissent at 144–45. This selective quotation by the

¶ 37. The court deduced from this statutory language a legislative intent "that a father's pre-delivery behavior be a consideration in determining whether the father had established a substantial parental relationship." *L.K.*, 113 Wis. 2d at 438. It concluded "that a parent's action prior to a child's birth can form a sufficient basis for determining whether that parent has

---

dissent underscores the infirmity of the dissent's argument. The disjunctive "or" between "child" and "mother" sets pregnancy as the time period during which a father is expected to "express concern for or interest in the support, care or well-being" of the *mother*.

"Because what happens to a fetus in utero can have a significant impact upon the quality of life a child will have after birth," a father's lack of concern for or interest in the welfare of the mother during pregnancy should be considered for purposes of determining whether the father has established a substantial parental relationship with the child. *L.K. v. B.B.*, 113 Wis. 2d 429, 439, 335 N.W.2d 846 (1983). Thus, the statute takes into account the father's post-birth actions toward the child, and his acts toward the mother during her pregnancy. These alternative focuses of the § 48.415(6)(b) language quoted by the dissent are amply demonstrated by the most recent incarnation of that section, the intent of which we assume the dissent would agree remains the same:

> In evaluating whether a person has had a substantial parental relationship with the child, the court may consider. . .whether the person has ever expressed concern for or interest in the support, *care or well-being of the child*, whether the person has neglected or refused to provide *care or support for the child* and whether, with respect to a person who is or may be the father of the child, the person has ever expressed concern for or interest in the support, *care or well-being of the mother during her pregnancy*.

Wis. Stat. § 48.415(6)(b) (1995–96) (emphasis added). We see no basis for inferring from either version of § 48.415(6)(b) a legislative intent to equate a fetus with a child for purposes of Chapter 48.

established a substantial parental relationship with the child." *Id.* at 439. Nowhere in the opinion does the court even intimate that the legislature used the word "child" in § 48.415(6)(b) to include a fetus, which is not surprising, since such an inquiry was not necessary to resolve the issue presented. We therefore conclude that *L.K.* is not germane to our analysis.

¶ 38. The court of appeals' reliance on *Roe, Kwaterski, Puhl,* and *Black* evidences the fundamental error in its analysis. While positing the correct question—whether the legislature intended to include a fetus within the § 48.02(2) definition of "child"—the court of appeals answered a distinctly different one—whether the legislature could, consistent with the United States and Wisconsin Constitutions, have included a fetus within the term "child." Because we conclude that the legislature did not intend to equate a fetus with a child, we do not reach the question answered by the court of appeals.

¶ 39. Finally, the confinement of a pregnant woman for the benefit of her fetus is a decision bristling with important social policy issues. We determine that the legislature is in a better position than the courts to gather, weigh, and reconcile the competing policy proposals addressed to this sensitive area of the law. This court is limited to ruling on the specific issues as developed by the record before it. We base our decisions on the facts as presented by adversarial parties who often narrow the scope of a much larger policy issue.

¶ 40. This court was confronted with a similar dilemma in *Eberhardy v. Circuit Court for Wood County,* 102 Wis. 2d 539, 307 N.W.2d 881 (1981). In *Eberhardy,* we acknowledged that circuit courts have the subject matter jurisdiction to order the sterilization of the mentally handicapped. However, because the

legislature had not yet determined the State's public policy or set guidelines for such sterilization, we directed the courts to refrain from ordering the procedure. This court stated:

> This case demonstrates that a court is not an appropriate forum for making policy in such a sensitive area. Moreover, irrespective of how well tried a case may be—and we consider the instant one to have been well presented and carefully considered—there are inherent limitations in the factual posture of any case which make the extrapolation of judicially made policy to an entire area of such a sensitive nature as this risky indeed. The legislature is far better able, by the hearing process, to consider a broad range of possible factual situations. It can marshal informed persons to give an in-depth study to the entire problem and can secure the advice of experts. . .to explore the ramifications of the adoption of a general public policy. . . .

*Eberhardy*, 102 Wis. 2d at 570–71.

¶ 41. For similar reasons, we determine that the detention of a pregnant woman for acts harming her fetus is a policy issue best addressed initially by our legislature.[15] Our conclusion is amply illustrated by the following exchange at oral argument:

---

[15] Similarly, the American Medical Association Board of Trustees has determined that courts are an inappropriate forum for reconciling the conflicting interests present when a pregnant woman is detained in order to preserve the health of her fetus.

> [C]ourts are ill-equipped to resolve conflicts concerning obstetrical interventions. The judicial system ordinarily requires that court decisions be based on careful, focused deliberation and the cautious consideration of all facts and related legal concerns.

GUARDIAN AD LITEM: . . .You asked a legislative history question before. 1955 was the first time that the definition of child appeared in 48.02(2). It was revamped next in 1977 where the distinction of CHIPS was established. It was revisited again in 1996. We cannot wait another 20-some years for the legislature to address this problem.

JUSTICE BABLITCH: Are you suggesting that we hold public hearings to determine how serious the harm must be before the State intervenes? That we hold public hearings to determine whether or not this seriousness occurs in the first trimester as opposed to the third, or hold public hearings on any of the other myriad public policy ramifications that such a holding you're asking us to do necessarily implicates?

GUARDIAN AD LITEM: I agree, your Honor, that that would be the role that the legislature would take.

JUSTICE BABLITCH: These are questions that we're not equipped to deal with as a court. We don't have the AMA or people coming in to testify to us, to explain to us the various medical ramifications. We don't have ethics people coming in and explaining to us the ethical problems of interfering with the patient/physician relationship. We don't have people coming in at a public hearing to explain to us whether or not greater harm can come to a viable fetus for lack of medical care which, some people say, would be the result of what you want. We're not a legislative body.

Helene A. Cole, *Legal Interventions During Pregnancy: Court-Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women* (AMA Board of Trustees Report), 264 JAMA 2663, 2665 (1990).

GUARDIAN AD LITEM: . . .No, you're not in the business of holding public policy—excuse me—public discussions and public forums. That clearly is the arena of the legislature. But that's exactly the question that this court needs to decide is are you willing to take on this burden and address this issue now, which we are asking you to do because these children cannot wait. We cannot wait for extensive public hearings and public policies and continuous conflicting reports. I don't think that you're going to get much different information; you're just going to get more of the same.

¶ 42.　This court in no way condones the conduct of the petitioner. Yet, we are not free to register moral disapproval by rewriting the Children's Code under the guise of statutory construction.

¶ 43.　Our search to ascertain and carry out the legislature's intent results in the conclusion that the legislature did not intend to include fetus within the definition of "child." The legislative history sounds in silence. Although the issue of whether to include a fetus within the definition of "child" in Chapter 48 is one of great social, medical, religious, and ethical significance, there is no record of any dialogue or consideration of the issue. A reading of § 48.02(2) in context with other relevant provisions of the Children's Code, supports the conclusion that the legislature intended "child" to mean one born alive. Despite ample opportunity, the legislature has not expressly provided that a fetus is a "child" under the Code. We decline the guardian ad litem's invitation to "take on this burden" to fill the legislative void. Moreover, the sensitive social policy issues raised in this case weigh strongly in favor of refraining from exercising CHIPS jurisdiction over a fetus until the legislature has spoken definitively on

the matter. For the above reasons, we hold that the definition of "child" in § 48.02(2) does not include a viable fetus. Because the court of appeals erroneously held that the § 48.02(2) definition of "child" includes a fetus, we reverse the decision of that court.

*By the Court.*—The decision of the court of appeals is reversed.

¶ 44. N. PATRICK CROOKS, J. (*dissenting*). I do not join the majority opinion because the majority has not interpreted Wis. Stat. § 48.02(2) (1993–94)[1] in conformity with the express legislative purpose of the Children's Code. I also am not persuaded by the majority's attempt to distinguish the present case from past cases in which this court has indicated that the definitions of "child" and "person" include a viable fetus. Furthermore, I find it significant that although the legislature amended the Children's Code last session, it did not act to alter the court of appeals' interpretation of § 48.02(2) in *State ex rel. Angela M.W. v. Kruzicki*, 197 Wis. 2d 532, 541 N.W.2d 482 (Ct. App. 1995)—an interpretation in accord with the one set forth in this dissent.[2]

¶ 45. Wis. Stat. § 48.02(2) defines "child" as "a person who is less than 18 years of age." The majority holds that the legislature did not intend to include a

---

[1] All future references are to the 1993–94 Statutes unless otherwise indicated. However, note that 1995 Wis. Act 275 and 1995 Wis. Act 352, which became effective July 1, 1996, made significant changes to the Children's Code.

[2] The court of appeals concluded that a viable fetus is a "child" for the purposes of the Children's Code. *State ex rel. Angela M.W. v. Kruzicki*, 197 Wis. 2d 532, 560, 541 N.W.2d 482 (Ct. App. 1995).

viable fetus within this definition of "child" based on several factors. First, the majority emphasizes the lack of debate and dialogue regarding whether a fetus should be included in the definition of "child" in the legislative history of Chapter 48. Majority op. at 124. Second, the majority asserts that certain relevant sections of the Children's Code would be rendered absurd if the definition of "child" includes a viable fetus. *Id.* at 126–27. Finally, the majority concludes that *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 148 N.W.2d 107 (1967), in which this court held that the definition of "person" includes a viable fetus, is "unpersuasive in this context." *Id.* at 128–30.

## I.

¶ 46. The initial issue before the court is whether the definition of "child" in Wis. Stat. § 48.02(2) includes a viable fetus. Section 48.02(2) defines "child" as "a **person** who is less than 18 years of age." § 48.02(2) (emphasis added). Accordingly, resolution of this issue depends upon whether the legislature intended the words "child" and "person" to include a viable fetus.

¶ 47. As determined by the majority, reasonable minds could differ as to whether the definition of "child" in Wis. Stat. § 48.02(2) includes a viable fetus; therefore, the statute is ambiguous. Majority op. at 121–23. Accordingly, the court must examine extrinsic matters such as the history, context, subject matter, scope, and object of the statute in order to ascertain the legislative intent. *See, e.g., Stockbridge School Dist. v. DPI*, 202 Wis. 2d 214, 220, 550 N.W.2d 96 (1996) (quoting *Jungbluth v. Hometown, Inc.*, 201 Wis. 2d 320, 327, 548 N.W.2d 519 (1996)). After considering these extrinsic matters, I conclude that the legislature intended

the word "child" in § 48.02(2) to include a viable fetus for three reasons: (1) the ordinary and accepted meaning of the words "child" and "person;" (2) the express legislative purpose of ch. 48; and, (3) legislative inaction to the recent court of appeals' decision in *State ex rel. Angela M.W..*

## A.

¶ 48. First, in construing a statute, a court must give effect to the ordinary and accepted meaning of the language. *State v. Martin*, 162 Wis. 2d 883, 904, 470 N.W.2d 900 (1991) (citing *County of Walworth v. Spalding*, 111 Wis. 2d 19, 24, 329 N.W.2d 925 (1983)). In light of medical knowledge concerning fetal development, several sources, including precedent of this court, indicate that the ordinary and accepted meaning of the words "child" and "person" includes a viable fetus.[3]

---

[3] *See In Re Baby Girl K.*, 113 Wis. 2d 429, 335 N.W.2d 846 (1983) (holding that the word "child" as used in Wis. Stat. § 48.415(6)(b) includes a fetus), *appeal dismissed, Buhse v. Krueger*, 465 U.S. 1016 (1984); *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 148 N.W.2d 107 (1967) (concluding that the word "person" includes a viable fetus for purposes of wrongful death statute); *Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 355–56 99 N.W.2d 163 (1959) (referring to a viable fetus as a "child"), *overruled on other grounds by In re Estate of Stromsted*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980); *Whitner v. State*, No. 24468, 1996 WL 393164, at *1 (S.C. July 15, 1996) (in an analogous case, the court interpreted a provision of South Carolina's Children's Code that defined "child" as "person under the age of eighteen." The court held that the word "person," and therefore "child," includes a viable fetus.); *American Heritage Dictionary* 332 (3d ed. 1992) (defining "child" as "[a]n unborn infant; a fetus"); *Black's Law Dictionary* 239 (6th ed. 1990) (defining "child" as "unborn or recently born human being").

¶ 49. For example, in *Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 99 N.W.2d 163 (1959), *overruled on other grounds by In re Estate of Stromsted*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980), this court considered whether a child can recover for injuries allegedly caused by a car accident that occurred when the child was a non-viable fetus. Although the jury returned a verdict in favor of the child, the circuit court struck the award based on *Lipps v. Milwaukee Elec. Ry. & Light, Co.*, 164 Wis. 272, 159 N.W. 916 (1916).[4] The *Puhl* court affirmed the circuit court's decision on other grounds, finding that there was not sufficient evidence of causation. However, the court nonetheless considered the vitality of *Lipps*. The court stated:

> What is now known as the viable theory is based on medical knowledge and even on common knowledge that a **child in the viable stage** can and does live separately in the womb of its mother and can live and exist as an independent person if born in that stage. Based on this knowledge the courts began to allow recovery for injuries sustained while the **child was viable**. This reasoning was adopted in 1933 by the supreme court of Canada. . . . This reasoning has been followed by the states of Connecticut, Georgia, Illinois, Maryland, Missouri, New Hampshire, New York, and Oregon.

---

[4] In *Lipps*, the court held that "[s]ince a **non-viable child** cannot exist separate from its mother, it must in the law of torts be regarded as part of its mother, and hence, being incapable of a separate existence, it is not an independent person or being to whom separate rights can accrue." *Lipps v. Milwaukee Elec. Ry. & Light*, 164 Wis. 272, 276, 159 N.W. 916 (1916) (emphasis added).

*Puhl*, 8 Wis. 2d at 355–56 (emphasis added) (citations omitted).[5] *Puhl* is significant because the court used the word "child" to refer to a viable fetus. *Id.* at 355–56.

¶ 50. This court relied heavily on *Puhl* in *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 148 N.W.2d 107 (1967). The *Kwaterski* court was asked to determine whether the term "person" in Wis. Stat. § 331.03 (1963) includes a viable fetus. Section 331.03 provided:

> Whenever the death of a **person** shall be caused by a wrongful act, neglect or default and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages in respect thereof, then and in every such case the person who, . . .would have been liable, if death had not ensued, shall be liable to an action for damages notwithstanding the death of the **person** injured; provided, that such action shall be brought for a death caused in this state.

*Id.* at 15–16 (emphasis added). After considering *Puhl* in great detail, the *Kwaterski* court determined: "[T]he weight of authority continues the trend noticed in *Puhl*, favoring recognition of an unborn child as a person for purposes of recovery under a wrongful-death statute." *Id.* at 19. The court therefore held that a viable fetus is a "person" within the meaning of § 331.03. *Id.* at 22.

---

[5] The court also stated: "If the common law has any vitality, it has been argued that it should be elastic enough to adapt itself to current medical and scientific truths so as to function as an efficient rule of conduct in our modern, complex society." *Puhl v. Milwaukee Auto. Ins. Co.*, 8 Wis. 2d 343, 357, 99 N.W.2d 163 (1959), *overruled on other grounds by In re Estate of Stromsted*, 99 Wis. 2d 136, 299 N.W.2d 226 (1980).

¶ 51. *Kwaterski* has significant precedential value in the present case because the legislature has defined "child" as a "person" in Wis. Stat. § 48.02(2). *Kwaterski* therefore supports the proposition that the definition of "person," and hence "child," includes a viable fetus.

¶ 52. The majority attempts to distinguish *Kwaterski* by pointing out that "the wrongful death statute does no more than vindicate the interest of parents in the potential life that a fetus represents." Majority op. at 130. Therefore, the majority implies that *Kwaterski* "has limited applicability to the present case" because *Kwaterski* does not provide the fetus with legal rights. Majority op. at 130. However, this is a distinction without a difference, because the key issue in this case is **not** one of fetal rights. Instead, this case centers on a question of statutory interpretation, just as *Kwaterski* did.[6] *Kwaterski* is persuasive here because both *Kwaterski* and this case revolve around the question of whether a viable fetus is a "person" under Wisconsin statutes. Thus, the majority's conclusion that *Kwaterski* only vindicates the interests of parents does not provide a logical basis for concluding that the *Kwaterski* court's interpretation of "person" is inapplicable here.[7]

---

[6] Even the majority stresses from the outset that "this case is one of statutory construction." Majority op. at 130.

[7] Moreover, as the Supreme Court of South Carolina has concluded:

> [W]e do not see any rational basis for finding a viable fetus is not a "person" in the present context. Indeed, it would be absurd to recognize the viable fetus as a person for purposes of. . .wrongful death statutes but not for purposes of statutes proscribing child abuse.

143

¶ 53. This court's decision in *In re Baby Girl K.*, 113 Wis. 2d 429, 335 N.W.2d 846 (1983) ( *L.K. v. B.B.*), *appeal dismissed, Buhse v. Krueger*, 465 U.S. 1016 (1984), also supports the proposition that the word "child" includes a viable fetus. In *Baby Girl K.*, this court was called upon to decide whether the termination of parental rights under Wis. Stat. § 48.415(6)(a)2 could be based upon a parent's prenatal conduct. In order to decide this issue, the court considered the language of Wis. Stat. § 48.415(6)(b) (1981–82),[8] which read in relevant part:

> In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person **has ever expressed concern for or interest in the support, care or well-being of the child or the mother during her pregnancy. . . .**

*Id.* at 431 (emphasis added). Based on this language, the court concluded: "It is clear therefore that the legislature intended that a father's pre-delivery behavior be a consideration in determining whether the father had established a substantial parental relationship." *Id.* at 438. Furthermore, this court emphasized that "what happens to a fetus in utero can have a significant impact upon the quality of life a child will have after birth. . . ." *Id.* at 439.

¶ 54. *Baby Girl K.* is significant for two reasons. First, this court determined that the word "child" includes a fetus under Wis. Stat. § 48.415(6)(b), a sec-

---

*Whitner v. State*, No. 24468, 1996 WL 393164, at *3 (S.C. July 15, 1996).

[8] As of 1993–94, Wis. Stat. § 48.415(6)(b) had not changed in any significant manner.

tion of the Children's Code, when it concluded that this section authorizes a court to consider a parent's conduct before a child is born to determine whether the parent has established a substantial parental relationship with the child. *Id.* at 438. Second, this case highlights the language of § 48.415(6)(b), in which the legislature clearly used the word "child" to refer to a fetus. *See* § 48.415(6)(b) ("child or mother during her pregnancy").[9] Thus, both the language of § 48.415(6)(b) and the court's decision in *Baby Girl K* support the proposition that the word "child" in Wis. Stat. § 48.02(2) includes a viable fetus.

¶ 55. The majority finds justification for its conclusion that the legislature did not intend to include a viable fetus in the definition of "child" by emphasizing the absence in the legislative history of any "news accounts of debate, dialogue, or even consideration of whether fetus should be included in the definition of 'child' in Chapter 48." Majority op. at 123–24. However, lack of such legislative discussion did not prevent this court from holding that "person" in Wis. Stat. § 331.03 includes a viable fetus in *Kwaterski*.[10]

---

[9] I do not agree with the majority's interpretation of this phrase. *See* majority op. at 132 n.14. The focus of this section of the statute is on the parent's relationship with the child during the mother's pregnancy. My reading of this section is consistent with the holding in *Baby Girl K.* that the father's actions prior to birth of his child may form a sufficient basis for termination of his parental rights.

[10] I also do not find the lack of legislative debate to be of significant persuasive value, given the fact that the definition of child was originally enacted in 1919. Why would the legislature have debated whether a "child" included a viable fetus in 1919, since this was not such a controversial issue at that time?

Moreover, it is important to emphasize that the court is often faced with silence in the legislative history. However,

¶ 56. In addition, the majority considers Wis. Stat. § 48.02(2) in the context of other relevant sections of the Children's Code. Majority op. at 127–28. The majority concludes that it would lead to an absurd result in other sections of the Children's Code if "child" is interpreted to include a viable fetus. *Id.* at 127. However, in the sections that the majority emphasizes, interpreting "child" to include a viable fetus will not lead to ridiculous results. For example, as the majority points out, Wis. Stat. § 48.19(2) "requires the person taking a child into physical custody to immediately notify the parent by the most practical means." *Id.* If "child" is interpreted to include a viable fetus, § 48.19(2) will not be rendered absurd, since a logical reading of it requires notification to the father, as well as the mother. Likewise, Wis. Stat. § 48.19(1)(c) refers to the removal of a child "from his or her present custody." Again, this section will not be rendered inane, because the detention of a mother, and hence an unborn child, in a drug treatment program does, in effect, constitute a change in custody of the child—the viable fetus. It also is essential to point out that interpreting the word "child" in Wis. Stat. § 48.02(2) to include a viable fetus does not lead to an absurd **result**, but rather allows the state to protect a viable fetus from substantial harm, consistent with the objectives of the Children's Code. *See infra* § I B.

¶ 57. Furthermore, the majority erroneously assumes that every provision of the Children's Code

when the legislative intent is not explicitly stated in the drafting files or newspapers, we do not simply decline to interpret the language at issue. Instead, this court is required to consider extrinsic sources to ascertain the legislative intent, such as precedent and the purpose of the statute. This is exactly what this dissent has attempted to do.

must fit before it can conclude that the word "child" in Wis. Stat. § 48.02(2) includes a viable fetus. This is an erroneous assumption, because not every provision of the Children's Code is applicable to all situations. Common sense dictates that sections of the Children's Code relating to runaways will never apply to a very young child, i.e. a newborn. Despite the fact that every section of ch. 48 is not applicable in every situation, this court in *Baby Girl K.* did not have any difficulty in holding that the word "child" in Wis. Stat. § 48.415(6)(b), a section of the Children's Code, includes an unborn child.

¶ 58. Moreover, it is the application of the majority's interpretation of "child" in Wis. Stat. § 48.02(2) that leads to an absurd result, by rendering the state's power to protect a child dependent upon whether the child is inside or outside of the womb. For example, under the majority's interpretation of § 48.02(2), the state will have the power to protect an eight-month-old child that has been born prematurely; however, the state will have no power to protect an eight-month-old fetus that is in the womb. The *Kwaterski* court recognized the absurdity of distinguishing between a viable fetus and a born child in 1967. *See Kwaterski*, 34 Wis. 2d at 20. This court should certainly recognize the same absurdity in 1997.

## B.

¶ 59. Second, the legislative objectives enunciated in the Children's Code support a conclusion that "child" in Wis. Stat. § 48.02(2) includes a viable fetus. The preamble to the Children's Code expressly directs that the chapter "shall be **liberally construed** to effect the objectives" set forth by the legislature. Wis. Stat. § 48.01(2) (emphasis added). One of the objectives set forth by the legislature is "[t]o provide for the care,

protection, and wholesome mental and **physical** development of children. . . ." § 48.01(1)(b) (emphasis added). Section 48.01(2) also mandates that "[t]he best interests of the child shall always be of paramount consideration."

¶ 60. This court has stated that "a 'cardinal rule in interpreting statutes' is to favor a construction which will fulfill the purpose of the statute over a construction which defeats the manifest object of the act." *In re Estate of Halsted*, 116 Wis. 2d 23, 29, 341 N.W.2d 389 (1983) (quoting *Student Ass'n, University of Wisconsin-Milwaukee v. Baum*, 74 Wis. 2d 283, 294–95, 246 N.W.2d 622 (1976)); *accord UFE Inc. v. Labor & Indus. Review Comm'n*, 201 Wis. 2d 274, 288, 548 N.W.2d 57 (1996). We likewise have indicated that "the intent of a section of a statute must be derived from the act as a whole." *Standard Theaters, Inc. v. State, Dept. of Transp., Div. of Highways*, 118 Wis. 2d 730, 740, 349 N.W.2d 661 (1984); *Aero Auto Parts, Inc. v. State, Dept. of Transp., Div. of Highways*, 78 Wis. 2d 235, 239, 253 N.W.2d 896 (1977).

¶ 61. Accordingly, the canons of statutory construction require the court to interpret the word "child" in Wis. Stat. § 48.02(2) consistently with the purpose of the Children's Code, which is clearly to protect children at risk from harm. There can be no dispute that a mother's ingestion of cocaine after her fetus becomes viable has a substantial impact on the physical development of her child in utero and ultimately after birth.[11] Certainly, a mother's ingestion of cocaine is not

---

[11] *See* I.J. Chasnoff et al., *Cocaine use in pregnancy: Perinatal morbidity and mortality*, 9 Neurotoxicol Teratol 291 (1987). Studies have confirmed that the cessation of cocaine use in the third trimester can have a significant positive impact on the development of the fetus. These benefits include improved

in the best interests of her child, born or unborn. Moreover, what occurs in utero will have long lasting effects not only on the child, but on society as well.[12] Thus, interpreting the word "child" to include a viable fetus fulfills the express legislative objectives of the Children's Code, by allowing the state to intervene to protect and care for the physical development of an unborn child. Conversely, the majority's interpretation of "child" fails to liberally construe the Children's Code in order to carry out its intentions, fails to consider adequately the best interests of the child, and, in fact, defeats the manifest objectives of ch. 48.[13]

---

intrauterine growth, reduced incidences of seizures, and reduced incidences of premature labor which alleviates low birth weight and the multitude of problems associated with low birth weight babies. I.J. Chasnoff et al., *Temporal patterns of cocaine use in pregnancy: Perinatal outcome*, 261 JAMA 1741 (1989); I.J. Chasnoff, *Cocaine: Effects on pregnancy and the neonate*, in *Drugs, Alcohol, Pregnancy, and Parenting*, at 97–103 (1988).

[12] R.A. Aronson & L.H. Hunt, *Cocaine use during pregnancy: Implications for physicians*, 89(3) Wis. Med. J. 105 (1990) ("Cocaine damaged children, particularly those from impoverished home environments, are at great risk for school failure and dropout, juvenile crime, teenage pregnancy, unemployment, and chronic disabilities. According to Senator Lloyd Bentsen (D-Texas), chair of the Senate Finance Committee, government at all levels will soon be spending $15 billion annually to prepare cocaine-affected children to enter kindergarten.")

[13] The majority claims: "The logical extension of the dissent's argument regarding liberal construction would expand the definition of 'child' to the moment after conception." Majority op. at 130. I stress that this case deals only with the issue of whether the words "child" and "person" include a viable fetus. In addition, I emphasize that the United States Supreme Court and this court have drawn the line at viability. *See Planned*

## C.

¶ 62. Third, legislative inaction after the decision by the court of appeals in *State ex rel. Angela M.W.* indicates that the court correctly interpreted Wis. Stat. § 48.02(2). "Legislative inaction following judicial construction of a statute, while not conclusive, evinces legislative approval of the interpretation." *State v. Johnson*, 207 Wis. 2d 240, 247, 558 N.W.2d 375 (1997); *accord State v. Eichman*, 155 Wis. 2d 552, 566, 456 N.W.2d 143 (1990). The presumption of legislative adoption of a judicial interpretation is entitled to less weight when there is nearly complete inaction by the legislature. *Reiter v. Dyken*, 95 Wis. 2d 461, 471, 290 N.W.2d 510 (1980); *Green Bay Packaging, Inc. v. Department of Indus., Labor & Human Relations*, 72 Wis. 2d 26, 35, 240 N.W.2d 422 (1976). However, "[w]here the legislature has made amendments to the statutory section in question and has not corrected the court's interpretation, the presumption of adoption or ratification is strengthened." *York v. National Continental Ins. Co.*, 158 Wis. 2d 486, 497, 463 N.W.2d 364 (Ct. App.) (citing *Reiter*, 95 Wis. 2d at 471–72), *review denied*, 465 N.W.2d 656 (1990).

¶ 63. In the current case, the court of appeals' holding in *State ex rel. Angela M.W.* that the definition of "child" under Wis. Stat. § 48.02(2) includes a viable fetus was released on October 6, 1995. This was a published decision of the court of appeals, which therefore had "statewide precedential effect." Wis. Stat. § 752.41(2); *Wolf v. F & M Banks*, 193 Wis. 2d 439, 455–56, 534 N.W.2d 877 (Ct. App.) (quoting

*Parenthood v. Casey*, 505 U.S. 833 (1992); *Roe v. Wade*, 410 U.S. 113 (1973); *Kwaterski v. State Farm Mut. Auto. Ins. Co.*, 34 Wis. 2d 14, 148 N.W.2d 107 (1967).

§ 752.41(2)), *review denied*, 537 N.W.2d 572 (1995); *see also In re Court of Appeals of Wisconsin*, 82 Wis. 2d 369, 371, 263 N.W.2d 149 (1978); *Skrupky v. Elbert*, 189 Wis. 2d 31, 56, 526 N.W.2d 264 (Ct. App. 1994). After October 6, 1995, the legislature revised the definition of "child," and made substantial changes to the Children's Code in general. Specifically, 1995 Wis. Act 352, § 10p, enacted on May 23, 1996, and effective on July 1, 1996, directly changed the definition of "child" in Wis. Stat. § 48.02(2) of the Children's Code. In addition, 1995 Wis. Act 275, enacted April 22, 1996, and effective July 1, 1996, made extensive changes to ch. 48 in general. However, the legislature did not alter the court of appeals' interpretation of "child" in either of these amendments. This legislative inaction following the court of appeals' decision demonstrates legislative approval of the court's interpretation of § 48.02(2). *Johnson*, 207 Wis. 2d at 247; *Eichman*, 155 Wis. 2d at 566; *Reiter*, 95 Wis. 2d at 471; *Milwaukee Fed'n of Teachers, Local No. 252 v. Wisconsin Employment Relations Comm'n*, 83 Wis. 2d 588, 599, 266 N.W.2d 314 (1978) (quoting *Zimmerman*, 38 Wis. 2d at 633–34).[14]

---

[14] I reject the majority's determination that legislative acquiescence to a court of appeals' decision is of no value because the legislature cannot be presumed to know that the decision will remain unchanged. *See* majority op. at 125–26. The grant of review in a case does not render the legislature powerless to clearly state its intent, especially where it is currently revising the very statutory language at issue. In addition, the majority supports its conclusion with a portion of the following quote: "The legislature is presumed to know that in absence of its changing the law, the construction put upon it by the courts will remain unchanged. . . ." *Zimmerman v. Wisconsin Elec. Power Co.*, 38 Wis. 2d 626, 633–34, 157 N.W.2d 648 (1968).

¶ 64. Despite this overwhelming support to the contrary, the majority has reached the conclusion that the legislature did not intend to include viable fetus within the definition of "child". Majority op. at 137–38. The majority states: "Despite ample opportunity, the legislature has not expressly provided that a fetus is a 'child' under the Code. We decline the. . .invitation to 'take on this burden' to fill the legislative void." *Id.* However, interpreting the term "child" in Wis. Stat. § 48.02(2) to include a viable fetus does not constitute a "rewriting [of] the Children's Code under the guise of statutory construction," as the majority suggests. *Id.* at 136–37. Instead, interpreting the word "child" to include a viable fetus fulfills the express purpose of the legislature in ch. 48, and is in conformity with precedent of this court. It simply is not within the spirit of the Children's Code or in accordance with past case law to exclude a viable fetus, capable of life outside the womb, from the same protection afforded a born child under the Children's Code.

## II.

¶ 65. Since I am satisfied that the legislature intended the definition of "child" to include a viable fetus under Wis. Stat. § 48.02(2), the arguments concerning the juvenile court's jurisdiction and the alleged

---

This statement was originally made by the court ten years prior to the development of the court of appeals, and therefore could not have been intended to stand for the proposition that acquiescence to a court of appeals' decision has no significance. Although this language was quoted by the court in *Reiter v. Dyken*, 95 Wis. 2d 461, 471, 290 N.W.2d 510 (1980), the *Reiter* court in no way indicated that it was relying on this statement to mean anything other than what it meant in 1968.

violation of Angela's constitutional rights to due process of law and equal protection must be addressed.

¶ 66. Angela first argues that the juvenile court did not have original jurisdiction over her or her viable fetus under Wis. Stat. § 48.13.[15] However, the statute does not require jurisdiction over a parent in order to obtain jurisdiction over a child. As the court of appeals determined: "The order worked its custodial effect on Angela not because the juvenile court has asserted jurisdiction over her, but because Angela and her fetus are physically and biologically one." *State ex rel. Angela M.W.*, 197 Wis. 2d at 562.

¶ 67. Accordingly, the pertinent issue is whether the juvenile court had jurisdiction over Angela's viable fetus. In order to take a child into protective custody pursuant to Wis. Stat. § 48.19, the county must make a showing satisfactory to the juvenile court that the welfare of the child demands that the child be immediately removed from his or her present custody. See § 48.19(1)(c). In the present case, the county met this burden to the satisfaction of the juvenile court and, as a result, the order was issued. The conclusion that "child" includes a viable fetus, coupled with the finding that the court fulfilled the requirements of § 48.19(1)(c), leads to the conclusion that the juvenile court had jurisdiction over Angela's viable fetus.

¶ 68. Angela next contends that the custodial effect of the protective order violated her due process liberty interest under the United States Constitution

---

[15] Section 48.13 provides in part: "The court has exclusive original jurisdiction over a child alleged to be in need of protection or services which can be ordered by the court, and:. . . ." The statute then lists eighteen scenarios in which the court may exercise its jurisdiction.

and the Wisconsin Constitution.[16] The test for violation of a fundamental liberty interest is two pronged. First, in order to restrict a fundamental liberty interest, a challenged statute must further a compelling state interest. *E.g., Zablocki v. Redhail*, 434 U.S. 374, 388, (1978); *State v. Post*, 197 Wis. 2d 279, 302, 541 N.W.2d 115 (1995), *petition for cert. filed*, Mar. 7, 1996. Second, the statute must be narrowly tailored to serve that compelling state interest. *E.g., Post*, 197 Wis. 2d at 302.

¶ 69. In regard to the state interest implicated here, the United States Supreme Court has determined:

> With respect to the State's important and legitimate interest in potential life, the "compelling" point is at viability. This is so because the fetus then presumably has the capability of meaningful life outside the mother's womb. State regulation protective of fetal life after viability thus has both logical and biological justifications.

*Roe v. Wade*, 410 U.S. 113, 163 (1973). Nearly twenty years later, the Court confirmed its position, stating:

> [T]he concept of viability, as we noted in *Roe*, is the time at which there is a realistic possibility of maintaining and nourishing a life outside the womb, so that the independent existence of the second life can

---

[16] As noted by the court of appeals, despite her invocation of the Wisconsin Constitution, Angela did not make a separate argument under the Wisconsin Constitution. *See State ex rel. Angela M.W. v. Kruzicki*, 197 Wis. 2d 532, 564 n.16, 541 N.W.2d 482 (Ct. App. 1995). All of her arguments rest on cases in which courts considered the federal constitution. Therefore, I do not address any possible implications of the Wisconsin Constitution.

in reason and all fairness be the object of state protection that now overrides the rights of the woman.

*Planned Parenthood v. Casey*, 505 U.S. 833, 870 (1992). The *Casey* Court further emphasized:

> [I]t must be remembered that *Roe v. Wade* speaks with clarity in establishing not only the woman's liberty but also the State's "important and legitimate interest in potential life." *Roe, supra*, at 163. That portion of the decision in *Roe* has been given too little acknowledgment and implementation by the Court in its subsequent cases.

*Id.* at 871. Thus, as determined by the United States Supreme Court, the state's interest in protecting the life and health of an unborn child becomes compelling and dominant once the fetus reaches viability.

¶ 70. In addition, this court's decision in *State v. Black*, 188 Wis. 2d 639, 526 N.W.2d 132 (1994), is also relevant. In *Black*, the petitioner allegedly caused the death of a fetus due to be born in five days by assaulting the unborn child's mother. The state subsequently charged Black with feticide under Wis. Stat. § 940.04(2)(a).[17] *Id.* at 643. Black argued that the feticide statute, due to its title of "abortion," could not be enforced against him. *Id.* at 644. The court held that Black was properly charged with feticide because the "statutory language clearly and simply proscribes the intentional destruction of a quick child." *Id.* at 645. Accordingly, the *Black* court concluded that the state

---

[17] Section 940.04(2)(a) (1989–90) provided in pertinent part: "Any person, other than the mother, who does either of the following may be imprisoned not more than 15 years:. . .Intentionally destroys the life of an unborn quick child;. . ." *State v. Black*, 188 Wis. 2d 639, 644, 526 N.W.2d 132 (1994).

may enact legislation to protect a viable fetus in areas other than simply abortion, and, therefore, implicitly determined that the state has a compelling interest in the welfare of a viable fetus in other contexts.[18] *See id.* at 645.

¶ 71. In the present case, there is no dispute that Angela's child was a viable fetus when the petition was filed, that Angela was actively using cocaine, and that the use of cocaine put the child at substantial risk of great bodily harm or possibly death. As such, the state has a compelling state interest to protect Angela's fetus under *Roe*,[19] *Casey*, and *Black*.

¶ 72. The next issue therefore is whether the infringement on Angela's liberty is narrowly tailored to further the compelling state interest. I conclude that it is. The Children's Code specifies the procedures necessary to further the state's compelling interest in the protection of children. These procedures must be complied with before the state can exercise its right to detain and ultimately protect a child.

¶ 73. In particular, the Children's Code requires the state to have jurisdiction over the child. *See* Wis.

---

[18] Even the majority recognizes that in *Black*, this court determined that the legislature can act to protect a viable fetus in contexts other than abortion. *See* majority op. at 131–32.

[19] The court of appeals succinctly summarized the significance of *Roe* to the current case when it stated:

> By recognizing that a state may intervene in an abortion decision after viability, *Roe* necessarily recognizes the right of the state to protect the potential life of the fetus over the wishes of the mother to terminate the pregnancy. Why then cannot the state also protect the viable fetus from maternal conduct which functionally presents the same risk and portends the same result—the death of the viable fetus?

*State ex rel. Angela M.W. v. Kruzicki*, 197 Wis. 2d 532, 552 n.11, 541 N.W.2d 482 (Ct. App. 1995).

Stat. § 48.13. Wis. Stat. § 48.19 provides that the state's power to take a child into custody is limited by specifically enumerated regulations. In addition, the state must conduct a hearing within 24 hours of the time the decision was made to hold the child in protective custody. Wis. Stat. § 48.21.[20] At the hearing, the juvenile court must determine whether there is probable cause to believe the child is within the jurisdiction of the court, and that the child will be subject to injury if he or she is not taken into protective custody.[21] Wis. Stat. § 48.205; Wisconsin Legislative Council Staff, Staff Brief 94–1, *Overview of Wisconsin Law Relating To Children in Need of Protection or Services*, at 23 (Sept. 1, 1994). In light of all the statutorily imposed procedures necessary to detain a child, it is clear that the means by which the state's compelling interest is served are narrowly tailored to "attain the purposes and objectives of the legislation" to protect children. *State v. Yoder*, 49 Wis. 2d 430, 438, 182 N.W.2d 539 (1971), *aff'd*, 406 U.S. 205 (1972).

¶ 74. Finally, Angela argues that if the state is allowed to intervene when the mother ingests cocaine, this will "open the door" for the state to intervene whenever a mother acts in any manner that is potentially harmful to her viable fetus. Angela cites as examples the possibility of state intervention if a mother smokes or refuses to take her prenatal vitamins.

---

[20] 1995 Wis. Act 275, enacted April 22, 1996 and effective July 1, 1996, changed the time of the hearing from 24 hours to 48 hours.

[21] Section 48.205 lists several situations in which a probable cause showing would result in the detention of a child; however, only the portion relevant to this case was cited.

¶ 75. This argument is not a realistic one because ch. 48 contains the necessary protections against unreasonable or unjustified intervention by the state. Specifically, Wis. Stat. § 48.255(1)(e) requires a petition requesting that a court exercise jurisdiction over a child alleged to be in need of protection or services (CHIPS petition) to state "reliable and credible information which forms the basis of the allegations necessary to invoke the jurisdiction of the court." Accordingly, the test for determining compliance with § 48.255 is the same as that governing the sufficiency of a criminal complaint—probable cause. *In re Courtney E.*, 184 Wis. 2d 592, 601, 516 N.W.2d 422 (1994). In addition, Wis. Stat. § 48.13 lists eighteen scenarios in which ch. 48 authorizes the juvenile court to exercise its original jurisdiction. These scenarios represent situations in which the child is at substantial risk either because of his or her own actions or those of others. *See* § 48.13. For example, § 48.13(10), the subsection that the county relies on in this case, requires that the parent has "neglect[ed], refus[ed] or [been] unable for reasons other than poverty to provide necessary care, food, clothing, medical or dental care or shelter so as to **seriously endanger** the physical health of the child. . . ." § 48.13(10) (emphasis added).

¶ 76. Clearly, the Children's Code enables the state to intervene only when a child faces substantial risk. Thus, ch. 48 contains the necessary stopping point to protect against Angela's slippery slope argument.[22] In fact, if this were not true, then the same argument

---

[22] Moreover, the Milwaukee County District Attorney noted in his amicus brief at 11–12 that "despite the extensive and sustained headline coverage of Angela's case in the Milwaukee-area media last fall, in the last nine months the Milwaukee County District Attorney's Office has yet to receive a single

would have validity under the Children's Code even if the child has been born. *See Whitner v. State*, no. 24468, 1996 WL 393164, at \*3 (S.C. July 15, 1996).

¶ 77. In conclusion, I am satisfied that the legislature intended to include a viable fetus within the definition of "child" in Wis. Stat. § 48.02(2). The ordinary and accepted meaning of the words "child" and "person," as established by *Kwaterski, Puhl*, and *Baby Girl K.*, supports this conclusion. Furthermore, despite ample opportunity, the legislature did not alter the court of appeals' interpretation in *State ex rel. Angela M.W.* when it amended § 48.02(2). The legislature's acquiescence to the court of appeals' interpretation of § 48.02(2) indicates that this interpretation was correct and acceptable to the legislature. Finally, interpreting "child" in § 48.02(2) to include a viable fetus carries out the express purpose of the legislature in ch. 48. Consequently, I conclude that the majority's interpretation of § 48.02(2) defeats the legislative objectives of the Children's Code by denying its protections to a viable fetus, ignores established precedent, and fails to acknowledge the importance of legislative acquiescence to the court of appeals' decision.

¶ 78. For these reasons, I respectfully dissent.

¶ 79. I am authorized to state that Justice DONALD W. STEINMETZ and Justice JON P. WILCOX join this dissent.

■■■■■■

Angela-type CHIPS referral. . . . [T]he 'floodgates,' if opened, have not yet impacted Milwaukee County."