974 A.2d 448 (2009)
408 N.J. Super. 222
NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
V.M. and B.G., Defendants-Appellants.
In the Matter of J.M.G., A Minor.
Docket No. A-4627-06T4
Superior Court of New Jersey, Appellate Division.
Argued November 3, 2008.
Decided July 16, 2009.
Ruth Harrigan, Designated Counsel, argued the cause for appellant V.M. (Yvonne Smith Segars, Public Defender, attorney; Ms. Harrigan, of counsel and on the brief).
Miles Lessem, Designated Counsel, argued the cause for appellant B.G. (Yvonne Smith Segars, Public Defender, attorney; Mr. Lessem, of counsel and on the brief).
Lorena L. Salzmann, Deputy Attorney General, argued the cause for respondent (Anne Milgram, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Salzmann, on the brief).
Christopher A. Huling, Assistant Deputy Public Defender, argued the cause for the minor (Yvonne Smith Segars, Public Defender, Law Guardian, attorney; Mr. Huling, on the brief).
Lawrence S. Lustberg, Newark, argued the cause for Amicus Curiae Experts in Maternal and Neonatal Health, Birth and Child Welfare (Gibbons, P.C., attorneys; Mr. Lustberg and Jennifer B. Condon, on the brief).
*449 Lynn M. Paltrow, of the New York bar, admitted pro hac vice, argued the cause for Amicus Curiae Experts in Maternal and Neonatal Health, Birth and Child Welfare (Ms. Paltrow and Susan Jenkins, of the D.C. bar, admitted pro hac vice, attorneys, did not file a brief).
Before Judges CARCHMAN, R.B. COLEMAN and SABATINO.
PER CURIAM.
Defendants V.M. and B.G. appeal from the judgment of the Family Part which found that they abused and neglected their child, J.M.G. As a result of these findings, J.M.G. was placed in the custody and care of plaintiff Division of Youth and Family Services (DYFS). At a permanency hearing the judge approved DYFS's plan for termination of parental rights.
We have carefully reviewed this record in light of defendants' contention that the judge erred in finding abuse and neglect. We agree that the judge's findings as to V.M. were supported by the evidence adduced at the hearing, but as conceded by the Deputy Attorney General representing DYFS at oral argument before us, we disagree as to his findings as they relate to B.G. We further agree with the ultimate conclusion reached by our concurring colleague affirming the judgment as to V.M. and reversing as to B.G. In so doing, we adopt the facts as set forth in the concurring opinion, and we generally ascribe to the law, which he so thoroughly enunciates in that opinion. Where we part company is his discussion of whether V.M.'s refusal to consent to a cesarean section (c-section) can, as a matter of law, be considered an element of abuse and neglect. On the record before us, we do not agree that the issue need be decided.
While we acknowledge that the judge, in fact, did rely, in part, on such refusal in his findings of abuse and neglect, we are of the view that there was substantial additional evidence of abuse and neglect that supported the ultimate findings. Our view is consistent with DYFS' acknowledgement at oral argument that the judge need not have considered V.M.'s refusal on the merits of the issue of abuse or neglect. DYFS did assert, as well, that the judge could consider V.M.'s refusal and her later claim that she did not refuse, as these statements relate to her credibility.
As we have stated, the independent evidence presented, irrespective of the evidence concerning V.M.'s resistance to the c-section, amply supported the judge's ultimate finding as to V.M., and we affirm as to her. As to B.G., we reverse for the reasons set forth in the concurring opinion.
Affirmed as to defendant V.M.; reversed as to defendant B.G.
CARCHMAN, P.J.A.D. (concurring).
Defendants V.M. and B.G. are the biological parents of J.M.G., born on April 16, 2006. During her hospitalization in anticipation of J.M.G.'s delivery, V.M. demonstrated combative and erratic behavior including a refusal to consent to a cesarean section (c-section).[1] Despite the medical opinion that the fetus demonstrated signs of distress and that the procedure was necessary to avoid imminent danger to the fetus, the child was born by vaginal delivery without incident.
After the birth of the child, plaintiff Division of Youth and Family Services (DYFS) investigated. It learned of V.M.'s *450 refusal to consent to the c-section and discovered that V.M. had been under psychiatric care for twelve years prior to J.M.G.'s birth. Moreover, V.M. was not forthcoming about her treatment or diagnosis. B.G. also refused to cooperate with DYFS's efforts to obtain information.
DYFS commenced a Title 9 proceeding pursuant to the Abandonment, Abuse, Cruelty and Neglect Act (the Act), N.J.S.A. 9:6-8.21 to -8.106, and placed J.M.G. in its custody. At the fact-finding hearing, the trial judge found that J.M.G. was an abused and neglected child due in part to her parents' failure to cooperate with medical personnel at the time of her birth. V.M.'s refusal to consent to a c-section factored heavily into this decision. Later, at a permanency hearing, the judge approved DYFS's plan for termination of parental rights and foster family adoption.
On appeal, V.M. and B.G., among other arguments, assert that the judge erred in considering in his findings that they abused and neglected J.M.G. based on decisions that V.M. made concerning medical treatment, specifically, her refusal to consent to a c-section. At trial, DYFS asserted that V.M.'s refusal to consent to a c-section was a relevant factor in accessing abuse and neglect. On appeal, DYFS maintained that position, however, at oral argument, DYFS suggested that the judge need not have considered such refusal in reaching his conclusion that V.M. abused and neglected J.M.G. DYFS did urge that such refusal and V.M.'s later assertion that she did not refuse the procedure were relevant to the issue of credibility.[2]
My majority colleagues conclude that irrespective of whether or not V.M. consented to the c-section, there was sufficient credible evidence to support a finding of abuse and neglect as to V.M. The majority therefore eschews any discussion of the issue of c-section.
I concur in the result reached as to both V.M. and B.G. I am of the view that even with the limited concession of DYFS as to the narrow utility of V.M.'s refusal to have a c-section, the issue remains extant and requires a level of judicial scrutiny. Consideration of V.M.'s refusal to submit to a c-section, in my view, is improper and beyond the legislative scope of the child-protective statutes. For this reason, I concur.

I.
These are the relevant facts adduced at the trial. On April 16, 2006, V.M. and B.G., who have been married since 1995, went to Saint Barnabas Hospital after V.M., pregnant with her first child, experienced contractions. V.M. presented as a forty-two-year-old woman who was thirty-five weeks pregnant and in labor.
V.M., who is college educated but has not been gainfully employed since a workplace accident in 1993, consented to the administration of intravenous fluids, antibiotics, oxygen, fetal heart rate monitoring, an episiotomy[3] and an epidural anesthetic. She refused to consent to any other invasive treatment, however, including a c-section or fetal scalp stimulation. Hospital personnel explained the potentially dire consequences of not allowing a c-section in the event of fetal distress, but V.M. remained adamant in her refusal.
In the hospital records, V.M. is described as "combative," "uncooperative," "erratic," "noncompliant," "irrational" and *451 "inappropriate." She ordered the attending obstetrician, Dr. Shetal Mansuria, to leave the room and told her if she did not do what V.M. said, she would be off the case. V.M. then threatened to report the doctor to the police. In fact, at one point V.M. did call the Livingston Police to report that she was being abused and denied treatment. She told a nurse that "no one is going to touch my baby." She continuously refused to wear the face mask that provided her with oxygen and also refused to remain still in order to allow for fetal heart monitoring. She thrashed about to the extent that it was unsafe for the anesthesiologist to administer an epidural. She would not allow Dr. Mansuria to touch the baby or perform an ultrasound examination. Throughout this entire period, V.M. "was very boisterous and yelling and screaming at the top of her lungs."
B.G. was present while all of these events occurred. Dr. Mansuria explained the complications, such as brain damage, mental retardation and fetal death, that could occur if the fetus went into distress and a c-section was not performed. She also explained that an examination revealed a "nonreassuring fetal status." B.G. said that he understood the risks, but V.M. would not consent to the procedure.
The hospital responded appropriately to confront V.M.'s mental state and her refusal to consent to the c-section. After considering V.M.'s "extreme behavior" and signs of developing fetal distress, the hospital staff requested an emergency psychiatric evaluation to determine V.M.'s competency. Dr. Devendra Kurani responded to the delivery room and spoke to V.M. for approximately one hour. While Dr. Kurani was there, the anesthesiologist was able to administer an epidural. V.M. informed Dr. Kurani that she had a psychiatric history and had been on medication prior to getting pregnant. B.G. confirmed that V.M. had been treated by a psychiatrist for post-traumatic stress disorder and had been prescribed Zoloft, Prozac and Seroquel. When Dr. Mansuria stressed the need for V.M. to consent to a c-section, V.M. stated that she understood the risks, but she did not want the procedure. Dr. Kurani then made a critical finding. Although he acknowledged that V.M. was very anxious, Dr. Kurani concluded that V.M. was not psychotic and had the capacity for informed consent with regard to the c-section. At no time did anyone seek judicial intervention or the appointment of a special medical guardian.
After Dr. Kurani left, the staff requested a second psychiatric opinion from Dr. Jacob Jacoby. Before Dr. Jacoby's evaluation was completed, V.M. gave birth vaginally to J.M.G. without incident. In his report, Dr. Jacoby recounted V.M.'s professed history of childhood abuse, workplace violence and societal discrimination. He noted that V.M. was treated by a psychiatrist, Dr. Ronnie Lee Seltzer, for many years until V.M. stopped seeing her allegedly at the behest of her lawyers. Although he concluded that V.M. appeared to be cognitively intact, he admitted that "there is a gnawing concern overall that the patient may not be as intact as I may have described."
Later that day, Dr. Jacoby dictated an addendum report recounting a conversation with Dr. Seltzer. Dr. Seltzer related that she initially treated V.M. for post-traumatic stress disorder but later began to appreciate that V.M. suffered from either a schizoaffective disorder or a bipolar disorder. Dr. Seltzer questioned the reliability of B.G. and was concerned about V.M.'s "ability to care for her child in a responsible manner." Dr. Jacoby also related a conversation with B.G. in which B.G.

*452 indicated that he feels the way the patient [V.M.] is acting now is not her normal manner and that she is not as "tranquil." She seems to be more rambunctious and over expansive (i.e., in a possible hypomanic state)[.] He also was hesitant but seemed to intimate that the patient has in fact had episodes of psychotic ideation, which he did not want to elaborate upon, prior to this present birth.
Dr. Jacoby concluded that V.M.'s and B.G.'s ability to parent the child "needs to be more fully evaluated by state social services."
Despite being slightly premature, J.M.G. was in good medical condition upon her vaginal delivery. She was taken to the neonatal intensive care unit, placed on antibiotics and observed for signs of jaundice. No drugs or alcohol were detected in her blood or urine.
A social worker at Saint Barnabas Hospital contacted DYFS on April 18, 2006, to report concerns over releasing J.M.G. to her parents' care. Caseworker Heather Frommer immediately went to the hospital, interviewed staff and spoke to V.M. and B.G. V.M. and B.G. denied that V.M. had ever received psychiatric treatment, had ever refused to consent to a c-section or had ever been evaluated by a hospital psychiatrist. Frommer then spoke to Dr. Kurani, who stated that he prescribed Zyprexia for V.M., but she refused to take it. He also said that V.M. "distorts everything that is told to her."
Frommer informed V.M. and B.G. that once J.M.G. was medically cleared for discharge, she would not be going home with them. V.M. became upset, started yelling and called the police. Frommer told B.G. and V.M. that there would be a court hearing on the matter on April 20, 2006, and wrote down the relevant information on a piece of paper. After Frommer left, V.M. was discharged from the hospital. Later that day, Frommer went to the parents' apartment to complete a home assessment and reminded V.M. and B.G. about the court hearing on April 20.
On the morning of April 20, Frommer phoned the parents to remind them again of the hearing. B.G. answered the phone, but denied that he was B.G. and denied knowing Frommer. He insisted he did not know what she was talking about with regard to the court proceeding. When Frommer immediately attempted to call back with her supervisor on the line, no one answered the telephone. Neither V.M. nor B.G. appeared at the April 20 hearing. J.M.G. was discharged from the hospital on April 24, 2006, and placed in foster care.
Another hearing followed on May 9, 2006, at which time V.M. told the trial judge that she saw Dr. Seltzer from 1994 to 2005 as the result of an injury she suffered at work after being forced to participate in a mock boxing match. Seltzer diagnosed her as suffering from post-traumatic stress disorder, depression and panic; but in 2005, a psychiatrist working for the State of New York Worker's Compensation Board told her that she was cured and no longer needed treatment. The judge directed V.M. to release her psychiatric records to DYFS, and if they confirmed what she said, J.M.G. would be returned to her.
Dr. Seltzer's certified records were presented to the court at the fact-finding hearing on May 24, 2006. Her handwritten notes, which memorialized V.M.'s weekly treatment from June 20, 1994, to January 4, 2006, supported the information presented in Dr. Jacoby's addendum report. Initially, Seltzer diagnosed V.M. as suffering from post-traumatic stress, panic disorder and major depression. As the years went by and V.M. made no progress *453 in coping with the 1993 workplace incident, Seltzer's notes increasingly discussed V.M.'s paranoia and psychotic ideations. Seltzer's notes from January 2006, reflected several telephone calls to V.M. to inquire about cancelled appointments. The notes concluded:
Surprised by [patient's] cancelling all future [appointments]. Learned that [patient's] litigation settled, which may have precipitated this decision. Attempted to contact [patient] to discuss the benefit of ongoing [therapy], but [patient] did not return any calls. Since [patient] demonstrates neither suicidal nor homicidal ideation, she is within her right to terminate [treatment], though clearly not recommended by this MD.
At the fact-finding hearing, V.M. informed the judge that she had had a wonderful prenatal experience.[4] She then offered information that proved to be in significant conflict with the hospital records. She stated that as soon as she got to the hospital, she signed the form giving the doctors permission to perform a c-section. Even though she was in extreme pain, it took the anesthesiologist several hours before administering an epidural. The first time he tried, the nurses were pushing her back and forth so violently that he could not administer the injection. Dr. Kurani was called at V.M.'s request to deal with the inappropriate behavior of the nursing staff.
V.M. recounted several more alleged instances of poor treatment by the hospital staff including indications of inappropriate comments by Dr. Mansuria and Dr. Jacoby regarding B.G., the color of his skin and the color of J.M.G.'s skin.
V.M. stated that Dr. Seltzer was medicating her for panic attacks. She never took the Seroquel that Dr. Seltzer prescribed because it was for severe conditions that she did not have, and it had many bad side effects. Dr. Seltzer agreed with her decision to discontinue treatment. The first time she heard that the doctors at Saint Barnabas had any psychiatric concerns with regard to her parenting was when Frommer came to her home on April 18. Despite Frommer's comments to the contrary, V.M. said that she did not learn of DYFS's involvement in the case until April 21 and that she never received notice of the court proceeding on April 20.
The judge identified the issue before him as whether J.M.G. was in imminent danger between April 16 and April 18, 2006. He observed that a series of events transpired in the hospital that were alarming and that might have caused a reasonable person to believe the child was in danger. He emphasized that although he believed that J.M.G. was in imminent danger, he did not base his finding solely on V.M.'s reluctance to consent to a c-section. In fact, he observed that there were probably many instances where a mother's refusal to accept a c-section would not constitute abuse.
After the judge reviewed the medical records of V.M.'s erratic behavior, he commented that V.M. appeared to care about having a healthy baby; nevertheless, he determined that she was "negligent" in not acceding to the doctors' requests and found that J.M.G. was an abused or neglected child under N.J.S.A. 9:6-8.21(c)(4).
The judge also rejected B.G. as a custodial parent (assuming V.M. left the marital premises), focusing on B.G.'s lack of cooperation with DYFS. The judge stated that J.M.G. would be returned to B.G. if certain *454 conditions were met: B.G. receives a psychological evaluation within the next week; the evaluator concludes that the child would be in no danger with B.G.; V.M. is not in the home; and a mechanism is in place for monitoring V.M.'s visits.
At the compliance review hearing of September 15, 2006, it became clear that the plan suggested at the fact-finding hearing had gone awry. Attempts to obtain psychological/psychiatric evaluations of V.M. and B.G. proved unsuccessful,[5] as had efforts to provide V.M. with parenting classes.[6]
The judge expressed his frustration, observing that he "wanted desperately to reunify this family," but the parents were "snatching defeat from the jaws of victory." He also expressed concern that no psychiatrists would undertake the evaluation if they thought they would be sued, to which V.M. responded, "[t]hat's your problem." When V.M. was asked if she would waive her right to sue psychiatrists, she replied, "[n]o way." As a result, the judge ordered that a psychiatrist be appointed who would have the same immunity as the court.
At the March 19, 2007 permanency hearing, J.M.G.'s foster mother offered that V.M. and B.G. visited the child once every two weeks. She noted that they always brought shopping bags full of supplies for the baby, and they always listened to the foster mother and followed her suggestions. She opined that they would be wonderful parents.
Dr. Vivian Chern Shnaidman performed a psychiatric evaluation of V.M. and B.G. for DYFS. She stated that her review of Dr. Seltzer's records indicated that V.M. was being treated for a psychotic disorder. She noted that despite V.M.'s high level of intelligence and education, she was not able to comprehend her situation. The doctor concluded that V.M. suffers from chronic paranoid schizophrenia and that her prognosis for improvement is poor without psychiatric treatment.
Dr. Shnaidman stated that B.G. was cognitively intact, but that he also suffers from psychosis. She described his diagnosis as "folie à deux," a rare condition in which one person subscribes to the psychoses and paranoid delusions of another. She explained that V.M. and B.G. function in a very paranoid and secretive way, with each person's paranoia supporting the other's.
Dr. Shnaidman concluded that J.M.G. would not be safe in V.M. and B.G.'s care. She stated that it would be dangerous and reckless to return the child to them, because "[t]hese are parents who live in a world that has nothing to do with the world that we live in. And anything could happen there at any time and there's no way to predict it." Her written report concluded that "[w]ithout appropriate psychiatric treatment, including aggressive psychopharmacological intervention, neither [V.M.] nor [B.G.] presents as a fit parent at this time."
V.M. and B.G. countered with Dr. Marc Cantillon as their psychiatric expert. *455 He stated that B.G. was anxious and distraught over DYFS's removal of his daughter, but he had no mental disorder of any kind. He concluded that B.G. would be a fit parent for J.M.G. He also believed that V.M. was a suitable and fit parent. He observed that her bizarre behavior at the hospital could have been caused by oxygen deprivation and that she expressed a willingness to obtain ongoing psychiatric care. He concluded that it would be safe to return J.M.G. to her parents' care immediately.
The trial judge found that he could not reunify J.M.G. with her parents. He commented: "I don't think I've ever seen a case of mental disorder where the diagnoses... [were] so diametrically opposed. We're in different worlds." Observing that Dr. Shnaidman's wording in advising against reunification was the strongest language he had ever seen in this type of case, he decided to maintain the status quo and obtain a qualified, impartial expert to offer a third opinion.
On March 19, 2007, the judge entered an order reflecting his findings that (1) "[i]t [was] not and will not be safe to return [J.M.G.] home in the foreseeable future because [of] mother's ... psychiatric condition [and] father's unwillingness to accept mother's psych[iatric] condition"; (2) DYFS made reasonable efforts to reunify the family; and (3) adoption was an appropriate plan because of V.M.'s psychiatric condition and non-compliance with treatment and B.G.'s lack of acceptance. He ordered that J.M.G. remain in placement and that DYFS find a pre-adoptive home.
Also on March 19, 2007, the court entered a multi-purpose order, requiring V.M. and B.G. to attend psychiatric treatment. Defendants now appeal from both of these orders.
On April 26, 2007, DYFS filed a complaint for termination of parental rights under FG-07-190-07. As we have noted, that judgment is presently on appeal. As a result, the litigation under FN-07-572-06 was dismissed, and defendants appeal from that order as well.

II.
I first briefly address the burden of proof and the standard of review. The burden of proof in child abuse and neglect cases is preponderance of the evidence. N.J. Div. of Youth & Family Servs. v. G.M. (In re K.M.), 198 N.J. 382, 398, 968 A.2d 698 (2009); N.J. Div. of Youth and Family Servs. v. J.L., 400 N.J.Super. 454, 468, 948 A.2d 172 (App.Div.2008). "[W]e must afford great deference to the Family Part's findings of fact and conclusions of law based on those findings." N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J.Super. 418, 433, 965 A.2d 174 (App. Div.2009). Deference is especially appropriate "when findings are based on the `trial court's credibility determinations.'" Ibid. (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279, 914 A.2d 1265 (2007)). We will "uphold the factual findings undergirding the trial court's decision if they are supported by `adequate, substantial and credible evidence' on the record." M.M., supra, 189 N.J. at 279, 914 A.2d 1265 (quoting In Re Guardianship of J.T., 269 N.J.Super. 172, 188, 634 A.2d 1361 (App.Div.1993)).
V.M. contends that the judge erred in (1) admitting the records from Saint Barnabas and from Dr. Seltzer; (2) allowing the DYFS worker to testify about the records from Saint Barnabas; and (3) allowing the court-appointed psychiatrist, Dr. Shnaidman, to testify "about conclusions made from twelve years of records from [Dr. Seltzer]." I and my colleagues in the majority have previously noted that the record is replete with substantive proofs *456 that V.M.'s condition and conduct related to J.M.G., after the birth of the child, was such as to warrant a finding of abuse and neglect. Her demonstrated psychological challenges as well as the impact of such a condition on her ability to care for the child were well demonstrated by the record, and I and the majority have little difficulty in accepting that finding and conclusion by the trial judge.
The Supreme Court has spoken forcefully that a court need not wait until a child is actually harmed by parental inattention or neglect before it acts in the welfare of such child. In re Guardianship of D.M.H., 161 N.J. 365, 383, 736 A.2d 1261 (1999). We are satisfied and as I shall discuss, infra, the findings as to V.M.'s mental health and its impact on J.M.G. support a finding of neglect. As to the finding of abuse and neglect as well as the use and consideration of records from St. Barnabas, Dr. Seltzer and Dr. Shnaidman, we conclude that V.M.'s arguments are without merit.

III.

A.
Two issues remain extant. First, whether since a judgment has been entered in the guardianship proceedings, the issues here are moot; and second, whether the judge properly considered V.M.'s refusal to consent to a c-section as a factor in the finding of abuse and neglect. I address the mootness issue first.
DYFS argues that the issues raised in this appeal are moot because the judge in the guardianship proceeding[7] issued a permanency order in connection with the termination proceeding, finding that DYFS proved that "[t]he child's safety, health or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1. It contends that a reversal or remand of the protective service orders at this stage will not change the fact that a guardianship matter overrides any finding made in reference to the protective service litigation.
B.G. argues that the abuse and neglect proceedings and termination proceedings are separate and should not overlap. He contends that we should not take notice of the findings in the guardianship proceedings because that decision is based on a different statute. That is accurate as "[a]buse-or-neglect and termination proceedings are brought under separate statutory schemes, require different burdens of proof, and allow for different remedies." N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 555, 643 A.2d 987 (1994). The burden of proof in an abuse-or-neglect proceeding is the preponderance of the evidence, while the burden of proof in a termination case is clear and convincing evidence. Id. at 557, 643 A.2d 987.
But there is a more fundamental reason for not finding this appeal moot. If a court determines that a child has been abused or neglected, "the name of the person found to have committed child abuse and any identifying information are entered into a Central Registry maintained by DYFS." N.J. Div. of Youth & Family Servs. v. M.R., 314 N.J.Super. 390, 398, 715 A.2d 308 (App.Div.1998) (citing N.J.S.A. 9:6-8.11; N.J.A.C. 10:129A-3.4) (footnote omitted). "Statutory authority for DYFS to investigate and monitor child abuse allegations appear in N.J.S.A. 9:6-8.8 to -8.20 and N.J.S.A. 9:6-8.21 to -8.82.... The regulations adopted to implement *457 the statute ... require DYFS to evaluate the available information to determine whether that allegation is `substantiated,' `not substantiated' or `unfounded.'" M.R., supra, 314 N.J.Super. at 398, 715 A.2d 308. "DYFS or other entity shall also, within [seventy-two] hours, forward a report of such matter to the child abuse registry operated by the division in Trenton." N.J.S.A. 9:6-8.11. In other words, "DYFS is required to forward any report of child abuse or neglect to the Central Registry...." N.J. Div. of Youth and Family Servs. v. D.F., 377 N.J.Super. 59, 64, 871 A.2d 699 (App.Div.2005).
The impact of the Registry is substantial. Although Registry reports are confidential, they "may be disclosed as authorized in N.J.S.A. 9:6-8.10a, subject to certain restrictions." M.R., supra, 314 N.J.Super. at 399-400, 715 A.2d 308. For instance, disclosure is allowed to "[a]ny person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual employed by or seeking employment with an agency or organization providing services to children." N.J.S.A. 9:6-8.10a(b)(13). The entry of an individual's name on the Central Registry gives rise to a significant liberty interest on the part of that individual. In Allegations of Sexual Abuse at East Park High School, 314 N.J.Super. 149, 160-61, 714 A.2d 339 (App.Div.1998) (stating that the New Jersey Constitution's due process protections give "a plaintiff a protectible interest in reputation warranting due process protections `without requiring any other tangible loss'"); M.R., supra, 314 N.J.Super. at 402-04, 715 A.2d 308 (stating "[t]he interest in reputation and the interest in nondisclosure have both been recognized as protect[i]ble liberty interests"). Concepts of fundamental fairness require that an individual be allowed to appeal the finding of abuse or neglect without regard to any subsequent determination in a termination proceeding.

B.
I now address the significant issue raised by the unique facts of this case whether V.M.'s refusal to consent to the c-section may be considered in determining the issue of abuse and neglect. The positions of the parties are simply stated. V.M. asserts that she had a fundamental right to refuse medical treatment during pregnancy, even at the risk of death to herself or the fetus. The law guardian, on behalf of the child and relying on New Jersey Division of Youth and Family Services v. L.V., 382 N.J.Super. 582, 889 A.2d 1153 (Ch.Div.2005), contends that a finding of abuse and neglect can only be based on a child's experiences after birth. He further contends that V.M. had a constitutional right to control her own body and to avoid unwanted medical procedures.
Amici Curiae, Experts in Maternal and Neonatal Heath, Birth, and Child Welfare,[8] support V.M.'s position and contend *458 that a judge may not consider a woman's refusal to consent to a c-section in the context of the child welfare laws.
DYFS responds that there was sufficient independent evidence in the record to support the court's finding of abuse and neglect, but at oral argument, it asserted that the judge could consider V.M.'s refusal to consent to the c-section and to later claim that she consented as it applies to her credibility.
My review of the issue requires an understanding of basic principles that inform our consideration. Parents have a constitutionally protected fundamental liberty interest in raising their biological children. Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S.Ct. 1388, 1394-95, 71 L.Ed.2d 599, 606 (1982). The federal and state constitutions protect the inviolability of the family unit. Stanley v. Illinois, 405 U.S. 645, 652, 92 S.Ct. 1208, 1212-13, 31 L.Ed.2d 551, 558-59 (1972); N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 599, 512 A.2d 438 (1986).
Yet, the government "is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized." Parham v. J.R., 442 U.S. 584, 603, 99 S.Ct. 2493, 2504, 61 L.Ed.2d 101, 119 (1979). The State, as parens patriae, may act to protect children from serious physical and emotional harm, even if this requires a partial or complete severance of the parent-child relationship. A.W., supra, 103 N.J. at 599, 512 A.2d 438. When the State exercises its responsibility to remove children from the custody of their parents, it is constrained to adhere scrupulously to the procedural safeguards established in Title 9, which governs the adjudication of abuse and neglect cases, or Title 30, which sets forth the procedures for the permanent removal of children from their parents. N.J. Div. of Youth & Family Servs. v. A.C., 389 N.J.Super. 97, 104-05, 911 A.2d 104 (Ch.Div.2006) (citing N.J. Div. of Youth & Family Servs. v. J.Y., 352 N.J.Super. 245, 261, 800 A.2d 132 (App. Div.2002)).
Upon the filing by DYFS of a verified complaint alleging abuse or neglect of a child, a judge must conduct a fact-finding hearing. N.J. Div. of Youth & Family Servs. v. L.A., 357 N.J.Super. 155, 163, 814 A.2d 656 (App.Div.2003) (citing N.J.S.A. 9:6-8.47). "The fact-finding hearing is a critical element of the abuse and neglect process" because a finding of abuse or neglect has "a profound impact on the lives of families embroiled in this type of a crisis." J.Y., supra, 352 N.J.Super. at 264-65, 800 A.2d 132. "Factual findings, therefore, must be based upon the preponderance of the evidence standard and `only competent, material and relevant evidence may be admitted.'" A.C., supra, 389 N.J.Super. at 106, 911 A.2d 104 (quoting N.J.S.A. 9:6-8.46(b)).
The purpose of a fact-finding hearing, as with all other proceedings under Title 9, is "to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them by other than accidental means." G.S. v. Dep't of Human Servs., 157 N.J. 161, 171, 723 A.2d 612 (1999) (quoting N.J.S.A. 9:6-8.8). "The safety of the children served shall be of paramount concern." N.J.S.A. 9:6-8.8(a). To that end and as we have previously noted, "the court `need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.'" N.J. Div. of Youth & Family Servs. v. S.S., 372 N.J.Super. 13, 24, 855 A.2d 8 (App.Div.2004) (quoting D.M.H., supra, 161 N.J. at 383, 736 A.2d 1261), *459 certif. denied, 182 N.J. 426, 866 A.2d 983 (2005). The focus of the court's concern must center on whether the parent "caused injury to the child and, if not, whether that parent is likely to do so in the future." Ibid.
A judge may find that a child is abused or neglected, if DYFS has established, by a preponderance of the evidence, that the child's
physical, mental or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent or guardian... to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof...; or by any other acts of a similarly serious nature requiring the aid of the court.
[N.J.S.A. 9:6-8.21(c)(4).]
There is no allegation that J.M.G. was actually harmed by her parents. Rather, the judge's finding was based solely on the imminent danger of harm presented by V.M.'s actions and mental condition.
The unique problem here is that much of V.M.'s erratic behavior occurred before J.M.G.'s birth, while V.M. was still pregnant. N.J.S.A. 9:6-8.21(b) defines "child" simply as "any child alleged to have been abused or neglected." Nothing in the statute or the attendant legislative history suggests that the Legislature intended that the provisions of the Act should apply to a fetus.[9]
L.V., supra, 382 N.J.Super. 582, 889 A.2d 1153, directly addressed the applicability of N.J.S.A. 9:6-8.21 to a fetus. In L.V., an abuse and neglect action was filed against a mother who had refused to take medications during her pregnancy that would have reduced the risk that her baby would be born HIV positive. Following birth, the baby tested negative for HIV, and DYFS presented no evidence that the baby suffered any physical harm as a result of being exposed to the virus in utero. The judge framed the issue before him as whether the mother's failure to take the prescribed medicines during her pregnancy, despite being advised of their benefits, constituted abuse or neglect. L.V., supra, 382 N.J.Super. at 589, 889 A.2d 1153.
In considering this question, the judge agreed with DYFS's contention that the situation was analogous to a pregnant mother's use of illegal drugs during her pregnancy. Id. at 589-90, 889 A.2d 1153 (citing In re Guardianship of K.H.O., 161 N.J. 337, 349-51, 736 A.2d 1246 (1999)). However, the judge observed that

it is the attendant suffering to the child, after birth, that a court must rely on in making a finding of abuse or neglect under those circumstances. The mother's decision to use narcotics or alcohol during her pregnancy alone is an insufficient basis for a finding of abuse or neglect.

Id. at 590, 889 A.2d 1153 (emphasis added).
*460 In K.H.O., the Court held that "[d]rug use during pregnancy, in and of itself, does not constitute a harm to the child under N.J.S.A. 30:4C-15.1(a)(1)," even though the Court recognized that drug use during pregnancy poses serious risks to the unborn. K.H.O., supra, 161 N.J. at 349-51, 736 A.2d 1246 (citations omitted). However, "an infant born addicted to drugs and suffering the resultant withdrawal symptoms has suffered harm that endangers her health and development within the meaning of [the statute]." Id. at 351, 736 A.2d 1246 (citations omitted).
In L.V., the judge observed that the proscription of finding that a mother committed an act of abuse or neglect against her child solely through her actions before the child's birth, was consistent with the Act. L.V., supra, 382 N.J.Super. at 590, 889 A.2d 1153. The judge reasoned that his conclusion was supported by the Act's failure to expressly include a fetus in its definition of a child and by provisions of the Act that contemplate the removal and placement of an abused and neglected child into DYFS custody, which could not apply to a fetus. He said: "[t]he Act ... does not and cannot be construed to permit government interference with a woman's protected right to control her body and her future during her pregnancy." Ibid. He held that the decisions that a woman makes as to what medications she will take during pregnancy are left solely to her discretion. Id. at 591, 889 A.2d 1153. "The right to make that decision is part of her constitutional right to privacy, which includes her right to control her own body and testing. Those rights include the ability to refuse medical treatment, even at the risk of her death or the termination of her pregnancy." Ibid. (citing Matter of Conroy, 98 N.J. 321, 353, 486 A.2d 1209 (1985); Right to Choose v. Byrne, 91 N.J. 287, 305, 450 A.2d 925 (1982); Matter of D.K., 204 N.J.Super. 205, 212-14, 497 A.2d 1298 (Ch.Div.1985)).
Based on the baby's condition and situation at the time of her removal from the mother, the judge concluded that DYFS failed to meet its burden of proving abuse and neglect by a preponderance of the evidence. Id. at 592, 889 A.2d 1153. The judge dismissed the complaint, but did not transfer legal custody of the baby back to the mother due to concerns over the mother's ability to provide continued medical treatment for the child. Ibid.
L.V. is consistent with New Jersey cases that have recognized a woman's constitutional right to make personal decisions concerning medical and surgical care during pregnancy. See Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 334, 828 A.2d 306 (2003) (recognizing that "principle[s] of individual autonomy... lie[] at the heart of a woman's right to make reproductive decisions"); Planned Parenthood of Cent. N.J. v. Farmer, 165 N.J. 609, 631-32, 762 A.2d 620 (2000) (recognizing that a woman has a fundamental liberty interest in controlling her body and her future); and Matter of Conroy, supra, 98 N.J. at 353, 486 A.2d 1209 (holding that competent persons are generally permitted to refuse medical treatment because the right to self-determination outweighs any countervailing state interests).
L.V.'s holding might appear to be inconsistent with the Court's decision in Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 42 N.J. 421, 201 A.2d 537, cert. denied, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964). In Anderson, a hospital sought the authority to administer blood transfusions to a pregnant woman in the event that such transfusions would be necessary to save her life and the life of her unborn child. The woman refused to consent to the transfusions on religious *461 grounds. Recognizing the State's justified concern for the welfare of the "infant," the Court stated that it was "satisfied that the unborn child is entitled to the law's protection and that an appropriate order should be made to insure blood transfusions to the mother in the event that they are necessary in the opinion of the physician in charge at the time." Id. at 423, 201 A.2d 537. Although it was concerned that the order would compel the mother to submit to an unwanted medical procedure, the Court concluded that "the welfare of the child and the mother are so intertwined and inseparable that it would be impracticable to attempt to distinguish between them." Ibid. Anderson is distinguishable as it did not address the issue of whether the mother's refusal to consent to a transfusion was abuse or neglect, and it was decided many years before the enactment of the Act.
Numerous decisions reached by courts in other jurisdictions support the holding in L.V., although many of the cases are decided in the context of criminal proceedings. See, e.g., Florida v. Gethers, 585 So.2d 1140, 1142 (Fla.Dist.Ct.App.1991) (holding that a charge of aggravated child abuse cannot be based on the mother's use of cocaine during pregnancy); Kentucky v. Welch, 864 S.W.2d 280, 284-85 (Ky.1993) (holding that a charge of criminal abuse cannot be based on the mother's use of drugs and alcohol during pregnancy); People v. Morabito, 151 Misc.2d 259, 580 N.Y.S.2d 843, 846-47 (N.Y.City Ct.1992) (refusing to interpret a criminal statute as applying to a fetus); Ohio v. Gray, 62 Ohio. St.3d 514, 584 N.E.2d 710, 713 (1992) (holding that the mother cannot be prosecuted for child endangerment based on drug use during pregnancy); Wyoming v. Osmus, 73 Wyo. 183, 276 P.2d 469, 475 (1954) (holding that a mother could not be found guilty of murder for failing to obtain medical care during childbirth).
These cases are informative, but they are not compelling because "[i]n criminal cases, the interpretation of a statute is restricted by the rule of lenity, which requires [a court] to strictly construe penal statutes in favor of a criminal defendant." State v. Froland, 193 N.J. 186, 194, 936 A.2d 947 (2007), clarified and modified, 195 N.J. 413, 949 A.2d 844 (2008). While a criminal statute might not be interpreted to impose liability on a mother who abuses drugs during pregnancy, a child welfare statute may well be interpreted to afford protection to a drug-addicted infant. See G.S., supra, 157 N.J. at 176, 723 A.2d 612 (noting that a Title 9 inquiry must focus on the harm to the child, not on the parent's culpable intent); State v. Demarest, 252 N.J.Super. 323, 330-31, 599 A.2d 937 (App. Div.1991) (distinguishing between criminal and civil child abuse statutes).
Nevertheless, there is ample child welfare jurisprudence from other states to support the holding in L.V. In In re Valerie D., 223 Conn. 492, 613 A.2d 748, 756 (1992), the court held that the Connecticut termination of the parental rights statute could not be interpreted to permit the termination of a mother's rights based upon her prenatal conduct. In reaching this conclusion, the court relied on the substantial legislative history of the statute, which revealed that the Legislature was concerned that using a mother's illegal drug use during pregnancy as a basis to terminate parental rights would dissuade women who had used illegal drugs from obtaining prenatal care and substance abuse counseling. Id. at 521-23, 613 A.2d at 764.
An even more comprehensive review of the question of whether a fetus is a "child" for purposes of a child welfare statute is found in Wisconsin ex rel. Angela M.W. v. Kruzicki, 209 Wis.2d 112, 561 N.W.2d 729 (1997). In Kruzicki, an obstetrician observed *462 that one of his patients was under the influence of cocaine or other drugs. He reported his concerns to the county authorities, who took the woman into custody and transported her to a hospital for treatment and protection. The woman petitioned for a writ of habeas corpus, arguing that the Wisconsin Children's Code did not confer jurisdiction over her or her viable fetus.
The Wisconsin Supreme Court agreed with the petitioner. Id. at 740. In so doing it stressed that the issue presented was one of statutory construction. Id. at 733. After reviewing the legislative history of the code and the use of the term "child" in other legislative enactments, the Court concluded:
Our search to ascertain and carry out the legislature's intent results in the conclusion that the legislature did not intend to include fetus within the definition of "child." The legislative history sounds in silence. Although the issue of whether to include a fetus within the definition of "child" ... is one of great social, medical, religious, and ethical significance, there is no record of any dialogue or consideration of the issue. A reading of [the statutory provision at issue] in context with other relevant provisions of the Children's Code, supports the conclusion that the legislature intended "child" to mean one born alive. Despite ample opportunity, the legislature has not expressly provided that a fetus is a "child" under the Code. We decline the guardian ad litem's invitation to "take on this burden" to fill the legislative void.
[Id. at 740.]
The Supreme Court of Arkansas conducted a similar analysis and reached a similar result in Arkansas Department of Human Services v. Collier, 351 Ark. 506, 95 S.W.3d 772 (2003). There, the Arkansas Department of Human Services declared a fetus to be neglected and placed it in protective custody based on the mother's chronic use of methamphetamine. Reviewing the applicable statutory provisions, the court determined that a fetus "obviously" did not fall within the statutory definition of a "juvenile." Id. at 778-79. It further observed that "[n]owhere has the General Assembly suggested that the term 'juvenile' encompasses an unborn fetus." Id. at 779. In reaching this decision, the court emphasized that the issue before it was solely one of "statutory construction." Id. at 781.
Other courts that have reached results consistent with Kruzicki and Collier include In the Matter of J.B.C., 18 P.3d 342, 347-48 (Okla.2001) (holding that a fetus is not a "child" for purposes of the Oklahoma Children's Code), and In the Matter of the Appeal in Pima County Juvenile Severance Action No. S-120171, 183 Ariz. 546, 905 P.2d 555, 557 (Ct.App.1995) (finding that mother's ingestion of alcohol during pregnancy could not be the basis for a finding of abuse because a fetus is not a "child" under the state child severance statute), review denied, 1996 Ariz. LEXIS 10 (Ariz. January 26, 1996).
The specific issue of refusal to consent to a c-section has been addressed by a number of courts. In re Baby Boy Doe, 260 Ill.App.3d 392, 198 Ill.Dec. 267, 632 N.E.2d 326, 326 (1994), the court was asked to balance the rights of a competent woman to refuse a c-section against the rights of the fetus that would benefit from that procedure. The court refused to engage in any such balancing, and held that "a woman's competent choice to refuse medical treatment as invasive as a cesarean section during pregnancy must be honored, even in circumstances where the choice may be harmful to her fetus." Ibid. In so doing, it observed that because "`the *463 circumstances in which each individual woman brings forth life are as varied as the circumstances of each woman's life' ... there can be no consistent and objective legal standard by which to judge a woman's actions during pregnancy." Id. 198 Ill.Dec. 267, 632 N.E.2d at 332 (quoting Stallman v. Youngquist, 125 Ill.2d 267, 126 Ill.Dec. 60, 531 N.E.2d 355, 360 (1988)). The court stated:
In Illinois a fetus is not treated as only a part of its mother. It has the legal right to begin life with a sound mind and body, assertable against third parties after it has been born alive. This right is not assertable against its mother, however, for the unintentional infliction of prenatal injuries. A woman is under no duty to guarantee the mental and physical health of her child at birth, and thus cannot be compelled to do or not do anything merely for the benefit of her unborn child.
[Ibid. (citations omitted).]
The court reached a similar conclusion in In re A.C., 573 A.2d 1235, 1237 (D.C. 1990), where a court-ordered c-section had been performed on a dying woman in an effort to save the life of her unborn child. Although both mother and child died, the appeals court addressed the issue of how a court should proceed when faced with a pregnant patient in extremis. It concluded that it was error for the trial court to have weighed the rights of the mother against the interests of the State because doing so violated the mother's right of bodily integrity. Id. at 1247.
There are holdings to the contrary. In In the Matter of Unborn Child, 179 Misc.2d 1, 683 N.Y.S.2d 366, 367 (N.Y.Fam.Ct.1998), a trial court found that a fetus was a neglected child after her mother tested positive for crack cocaine. The court reasoned that
it would be incongruous to imagine the Family Court Act's clear purpose being anything other than to protect children, including unborn children, from harm. Making a child endure an unsafe environment in the womb is ludicrous when this same child is afforded protection from illegal drugs and an unsafe environment the moment it takes its first breath outside the womb.
[Id. at 370.]
More significantly, in Jefferson v. Griffin Spalding County Hospital Authority, 247 Ga. 86, 274 S.E.2d 457, 458 (1981), the Supreme Court of Georgia authorized a hospital to perform a c-section and any necessary blood transfusions on a pregnant woman who refused medical treatment. In so doing, the court approved the trial court's finding that the "child is a viable human being and entitled to the protection of the Juvenile Court Code of Georgia" and that the "child is without the proper parental care and subsistence necessary for his or her physical life and health." Id. at 459.[10]
Courts that have addressed whether a fetus is a "child" for purposes of state child welfare laws have consistently treated the matter as a question of statutory interpretation. For that reason, while out-of-state precedent may be considered persuasive authority, it cannot be dispositive. The question presented here must focus on the interpretation of the Act.
*464 As noted by the court in L.V., supra, 382 N.J.Super. at 590, 889 A.2d 1153, nothing in the Act suggests that the Legislature intended the term "child" to encompass a fetus. L.V. was decided in 2005, and the Legislature has given no indication that the court erred in its interpretation of the Act. Although Anderson, supra, 42 N.J. at 421, 201 A.2d 537, afforded a fetus the protection of the court, the decision in Anderson predated the Act, did not address the issue of abuse or neglect and involved a blood transfusion, a much less invasive procedure than a c-section. In light of the more recent precedent established by cases such as Farmer, supra, 165 N.J. at 609, 762 A.2d 620, the approach advanced in L.V. provides a sound basis for concluding that for the purposes of the decision here, the plain language of the Act, New Jersey case law and the reasoning set forth in decisions from numerous other states support a conclusion that the protections afforded by N.J.S.A. 9:6-8.21, do not extend to a fetus because it is not a "child" as contemplated by this particular statute.
If V.M.'s fetus was not a child under this statute, then any decisions that she made with regard to prenatal treatment and surgery cannot form the basis of a finding of abuse and neglect. The judge did not base his finding solely on V.M.'s refusal to consent to a c-section, however, V.M.'s refusal to consent to invasive procedures clearly was a major consideration in his decision. For example, when discussing the fact that V.M. would not consent to fetal scalp stimulation, the judge said: "Think about that, not allowing me to evaluate the fetus. That strikes one asas the very heart of neglect." He concluded that "in the end with the mother's life and baby's life in balance, I think it was negligent ... not to accede to what the doctors requested. Possibly this was caused by her not taking the medication which Dr. Seltzer had prescribed for her...."
I would adopt the reasoning in L.V. as applied to the facts here. The decision to undergo an invasive procedure such as a c-section belongs uniquely to the prospective mother after consultation with her physicians. To allow such a decision to factor into potential charges of abuse or neglect requires a prospective mother to subjugate her personal decision to a governmental agency's statutory interpretation creating a scenario that was neither contemplated nor incorporated within the four corners of the relevant statutory language. Her decision on matters as critical as this invasive procedure must be made without interference or threat. V.M.'s decision to forego a c-section had no place in these proceedings.
However, I agree that there was sufficient additional evidence to support the judge's finding that V.M. placed J.M.G. in imminent danger from April 16 to April 20, 2006.[11] As the hospital records reflect, V.M. was "combative," "uncooperative," "erratic," "noncompliant," "irrational" and "inappropriate." She ordered the attending obstetrician to leave the room, did not allow the obstetrician to perform an ultrasound examination, told a nurse that "no one [was] going to touch [her] baby," refused to continuously wear the face mask that provided her with oxygen and would not remain still in order to allow for fetal heart monitoring and the administering of an epidural. Incredibly, she also called the Livingston Police to report that she was being abused and denied treatment when it was her "erratic" and "combative" behavior that was preventing the hospital staff from providing treatment.
*465 Both Dr. Jacoby, the hospital's psychiatrist who evaluated V.M., and Dr. Seltzer, V.M.'s previous treating psychiatrist, expressed concern over V.M.'s "ability to care for her child in a responsible manner." V.M.'s behavior during the delivery, her psychiatric records, and the opinions of Dr. Jacoby and Dr. Seltzer all support a finding that V.M. was not in a proper mental state to safely care for J.M.G. Therefore, the judge's finding that V.M. placed J.M.G. in imminent danger should not be disturbed.

IV.
As to B.G., he argues that the judge erred in finding that he abused and neglected J.M.G. He asserts that his name should be removed from DYFS's Central Registry of individuals determined to have abused and neglected a child. We all agree on that issue, including DYFS.
The law guardian supports B.G.'s arguments.[12] He observes that "[i]t is unclear whether the trial court intended to find abuse and neglect against both parents or just [V.M.]." He argues that if the judge did make such a finding, it must be reversed because B.G. could not compel V.M. to undergo a c-section or otherwise make medical decisions on her behalf. DYFS responds that the trial judge did not make a specific finding of abuse or neglect against B.G. and states that B.G. has not been listed on the Central Registry as a substantiated perpetrator.
The parties are correct when they point out that the judge never explicitly found that B.G. abused or neglected J.M.G. He did, however, answer B.G.'s request to assume custody of the child by stating that "[t]here was neglect on or around April 16th to April 20th. I have found that." Moreover, the judge's final order of May 24, 2006, states that "defendants abused or neglected the child(ren) in that they refused to cooperate with the medical professionals at Saint Barnabas Hospital during childbirth." (Emphasis added). The judge's order indicates that a finding of abuse and neglect was made against B.G.
Any such finding was clearly in error. As I have discussed, supra, a finding of abuse and neglect cannot be based on a mother's medical decisions during pregnancy. Moreover, even if V.M.'s other actions had endangered the child, B.G. could not have forced his wife to cooperate with the hospital staff. Any finding of abuse or neglect on B.G.'s part was clearly not supported by the record, and DYFS essentially concedes this point on appeal.
DYFS represents that B.G. has not been listed on the Registry. To avoid any issue in that regard, the order of May 24, 2006, must be reversed in order to clarify that no finding of abuse or neglect was ever entered against him.
Although the judge erred in entering a finding of abuse or neglect against B.G., he correctly denied B.G.'s request to assume custody immediately following the May 24 hearing. Dr. Jacoby's report questioned B.G.'s reliability and his fitness to assume parental responsibility. Frommer's observations in the hospital also gave rise to concern because B.G. denied that V.M. had ever received psychiatric care. Moreover, on the morning of the April 20 hearing, B.G. attempted to hide his identity and falsely said he did not know Frommer. His failure to attend the hearing left the judge little choice but to place the child in the custody of DYFS.
Finally, the judge did not flatly reject B.G.'s suggestion that he assume sole custody *466 of J.M.G. Rather, the judge was quite sympathetic to B.G. and said he hoped to reunite him with his daughter as soon as possible. He set forth three conditions that needed to be met before reunification could be achieved and clearly explained each to B.G. He did not require that B.G. undergo a psychiatric evaluation, but only that B.G. receive a favorable report from a psychologist. The judge set a tight time frame for the evaluation and even set a tentative reunification date. The fact that B.G. did not comply with the judge's directions supports the court's subsequent decisions to continue DYFS custody.
In sum, I concur in reversing the order as to B.G., affirming as to V.M. and affirming the orders granting custody to DYFS.
NOTES
[1] A cesarean section is an operative procedure involving an "incision through the abdominal wall and the uterus (abdominohysterotomy) for extraction of the fetus." Stedman's Medical Dictionary, Unabridged Lawyer's Edition 1267 (4th ed. 1976).
[2] By judgment of December 19, 2008, the Chancery Division judge terminated the parental rights of defendants as to J.M.G. That matter is now separately on appeal.
[3] An episiotomy is a surgical cut in the skin and muscle of the vagina during childbirth.
[4] This is contrary to a notation in V.M.'s discharge summary stating that V.M.'s obstetrician, Dr. Theodore Cohen, reported that V.M. was "noncompliant" and "combative" with "inappropriate affect" during prenatal office visits.
[5] Apparently, after one psychologist found the parents to be in "desperate" need of psychiatric care, the court was required to issue a restraining order to protect his safety. Another psychologist, who was assaulted in the parents' home, also obtained a restraining order. Another refused to provide psychiatric services without assurances that he would not be sued.
[6] The group contracted to provide parenting classes stated that it could not provide V.M. with services absent a psychological evaluation due to her disruptive and uncontrollable behavior.
[7] The judge in the Title 30 guardianship proceeding was not the trial judge in the Title 9 proceeding.
[8] Amicus Curiae, Experts in Maternal and Neonatal Health, Birth, and Child Welfare, include Dr. Howard Minkoff, M.D., Henci Goer, International Cesarean Awareness Network's (ICAN), Dr. Anne Lyerly, M.D., M.A., Dr. Lisa Harris, M.D., Dr. Marsden G. Wagner, M.D., Dr. Elizabeth M. Armstrong, Ph.D., American Association of Birth Centers (AABC), American College of Nurse-Midwives (ACNM), The New Jersey Chapter of the American College of Nurse Midwives, The Big Push for Midwives Campaign, BirthNet, Inc., Childbirth Connection, Child Welfare Organizing Project (CWOP), Choices in Childbirth, Citizens for Midwifery (CFM), The National Latina Institute for Reproductive Health (NLIRH), The National Association of Nurse Practitioners in Women's Health (NPWH), National Women's Health Network (NWHN) and Statewide Parent Advocacy Network (SPAN).
[9] Our review of the New Jersey Legislature Child Abuse Study Commission Interim Report (Pursuant to Assembly Concurrent Resolution No. 86) (November 15, 1971) and the Public Hearing before the New Jersey Legislature Child Abuse Study Commission (September 21, 1971), revealed no instance when the Commission considered whether the legislation should apply to an unborn fetus. All references to "child" or "children" in these materials clearly contemplated children-in-being.
[10] Although Jefferson appears to be the only reported appellate decision ordering a c-section, at least one writer claims that "several lower courts throughout the country have been faced with the decision whether to compel a pregnant woman to undergo a cesarean section." Eric M. Levine, Comment, The Constitutionality of Court Ordered Cesarean Surgery: A Threshhold Question, 4 Alb. L.J. Sci. & Tech. 229, 240 (1994). The author claims that "[i]n most instances, the cesarean section was ordered." Ibid.
[11] J.M.G. was removed on April 18, 2006; the hearing was held on April 20, 2006.
[12] At the fact-finding hearing, however, the law guardian opposed B.G.'s request to take J.M.G. home and argued that B.G. had contributed to the abuse and neglect.