# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2427-16T2
                 A-3407-17T2
                 A-3739-17T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

       Plaintiff-Respondent,

v.

Y.B.,

       Defendant-Appellant.

_____

IN THE MATTER OF S.G., T.B.,
S.B., and J.C.,

       Minors.

_____

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

       Plaintiff-Respondent,

v.

Y.B. and C.C.,

    Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF J.C.,

    a Minor.

_____

Submitted September 25, 2019 – Decided October 4, 2019

Before Judges Fuentes, Haas and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket Nos. FN-09-0386-11 and FG-09-0125-17.

Joseph E. Krakora, Public Defender, attorney for appellant Y.B. (Durrell Wachtler Ciccia, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant C.C. (Meghan K. Gulczynski, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Jason Wade Rockwell, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors S.G., T.B., S.B., and J.C. (Danielle Ruiz, Designated Counsel, on the brief).

A-2427-16T2

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor J.C. (Olivia Belfatto Crisp, Assistant Deputy Public Defender, on the brief).

PER CURIAM

In these three related children-in-court cases, defendant Y.B.[1] appeals from the Family Part's January 27, 2012 order,[2] following a fact-finding hearing, determining that Y.B. abused or neglected her four children by permitting C.C., the father of one of the children, J.C. (Jenna), to have contact with the children in violation of a previously imposed "no contact order" entered after C.C. threatened Y.B. and the children with a knife. Y.B. and C.C. also appeal from the court's March 14, 2018 judgment of guardianship terminating their parental rights to Jenna.[3]

In her abuse or neglect appeal, Y.B. contends that the trial judge erred in concluding that she placed the children at risk of serious harm by permitting C.C. to re-enter the home. In his termination of parental rights appeal, C.C.

---

[1] We refer to the adult parties by initials, and to the child and resource parent by fictitious names, to protect their privacy. R. 1:38-3(d)(12).

[2] This order became appealable as of right after the trial court entered a final order on January 5, 2017, dismissing the litigation.

[3] For purposes of this opinion, we consolidate Y.B.'s abuse or neglect appeal with the parents' respective termination of parental rights appeals, which were already consolidated.

A-2427-16T2

argues that the Division of Child Protection and Permanency (Division) failed to prove each prong of N.J.S.A. 30:4C-15.1(a) by clear and convincing evidence, while Y.B. limits her appeal to her allegation that the Division failed to satisfy prong three of the statutory test. The Law Guardian supports the court's finding of abuse or neglect on Y.B.'s part, and the termination of both defendants' parental rights to Jenna.

Based on our review of the record and applicable law, we are satisfied that the evidence in favor of both the Division's abuse or neglect complaint and its guardianship petition overwhelmingly supports the trial court's orders. Accordingly, we affirm substantially for the reasons set forth in the thorough oral decisions rendered by the court in each matter.

## I.

We begin with Y.B.'s abuse or neglect appeal. Y.B. is the mother of four minor children, including Jenna, who was born in May 2010. C.C. is Jenna's father.[4]

On September 3, 2010, C.C. committed an act of domestic violence when he chased Y.B. and the children with a knife. Y.B. locked herself in a bedroom,

___

[4] The record indicates that Y.B. and C.C. had been married, but it is not clear whether they divorced prior to these proceedings.

and C.C. kicked down the door. As the police arrived, they saw C.C. forcing the children out of the home. C.C. initially refused to surrender but, after the officers drew their weapons, they were able to subdue and arrest him.

C.C. was subsequently indicted for aggravated assault, possession of a weapon for an unlawful purpose, unlawful possession of a weapon, endangering the welfare of a child, child abuse, and burglary. The court released C.C. on bail on September 8, but entered a no contact order which prohibited C.C. from being near Y.B. or the children.

In February 2011, an assistant prosecutor advised the Division that she had called Y.B.'s home to speak to her and the phone was answered by C.C., who admitted he was alone in the home with Jenna. In a later phone call, Y.B. told the prosecutor that she was aware that C.C. was not allowed to have any contact with the children, although she did not have a copy of the court's written order. The Division met with Y.B., who denied that C.C. was living in the home.

On March 25, 2011, the Division received another referral indicating that one of the children had welts on her face. Y.B. denied striking the child. However, during the investigation, the children reported that C.C. was living in the home in violation of the no contact order.

One week later, the Division filed a verified complaint seeking custody of all four children, and charged Y.B. with child abuse or neglect under N.J.S.A. 9:6-8.21(c)(4)(b). Following a fact-finding hearing, Judge Mark J. Nelson rendered an oral decision, finding by a preponderance of the evidence that Y.B. abused or neglected the children by placing them in harm's way when she permitted C.C. to have contact with them in violation of the criminal court's no contact order.

On appeal, Y.B. contends that the Division "failed to present competent, reliable evidence that [she] failed to exercise proper supervision or guardianship and placed the children at a substantial risk of harm by knowingly and willfully violating the no contact order previously put in place against [C.C.]." We disagree.

Our task as an appellate court is to determine whether the decision of the Family Part is supported by substantial credible evidence in the record and is consistent with applicable law. Cesare v. Cesare, 154 N.J. 394, 412 (1998). We owe particular deference to a trial judge's credibility determinations and to "the family courts' special jurisdiction and expertise[.]" Id. at 413. Unless the judge's factual findings are "so wide of the mark that a mistake must have been made[,]" they should not be disturbed, even if we would not have made the same

A-2427-16T2

decision if we had heard the case in the first instance. N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007) (quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). "It is not our place to second-guess or substitute our judgment for that of the family court, provided that the record contains substantial and credible evidence to support" the judge's decision. N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012).

Through the admission of "competent, material and relevant evidence," the Division must prove by a preponderance of the evidence that the child was abused or neglected. N.J.S.A. 9:6-8.46(b). In pertinent part, N.J.S.A. 9:6-8.21(c)(4)(b) defines an "abused or neglected child" as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his [or her] parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

Thus, to find abuse and neglect under N.J.S.A. 9:6-8.21(c)(4)(b), the parent must fail to "exercise a minimum degree of care." A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers

7

inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." G.S. v. Dep't of Human Servs., 157 N.J. 161, 181 (1999). "Where an ordinary reasonable person would understand that a situation poses dangerous risks and acts without regard for the potentially serious consequences, the law holds him responsible for the injuries he causes." Id. at 179. In addition, "[w]hen a cautionary act by the guardian would prevent a child from having his or her physical, mental or emotional condition impaired, that guardian has failed to exercise a minimum degree of care as a matter of law." Id. at 182.

Each case of alleged abuse "requires careful, individual scrutiny" and is "generally fact sensitive" and "idiosyncratic." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 33 (2011). Both the nature of the injury inflicted and the conduct should be reviewed within the context of the family's circumstances at that moment. See Dep't of Children & Families, Div. of Youth & Family Servs. v. C.H., 416 N.J. Super. 414, 416 (App. Div. 2010).

Contrary to Y.B.'s contentions, a court does not have to wait until a child is actually harmed or neglected before it can act in the welfare of that minor. N.J. Div. of Youth & Family Servs. v. V.M., 408 N.J. Super. 222, 235-36 (App. Div. 2009) (citing In re Guardianship of D.M.H., 161 N.J. 365, 383 (1999)).

Thus, "[i]n the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 23 (2013) (citing N.J.S.A. 9:6-8.21(c)(4)(b)).

For example, in F.M., the Supreme Court held that a "parent has an obligation to protect a child from harms that can be inflicted by another parent." F.M., 211 N.J. at 449. In that termination of parental rights case, the court found that the defendant mother's failure to follow court orders barring contact with the biological father demonstrated her inability to protect the child from harm. Id. at 450-51. Similarly, this court has held the failure to protect a child against a risk of harm by another can constitute abuse or neglect. N.J. Div. of Child Prot. and Permanency v. K.N.S., 441 N.J. Super. 392, 399 (App. Div. 2015).

Here, there was sufficient evidence in the record to support Judge Nelson's finding that Y.B. abused or neglected the children by exposing them to a risk of harm. The record reveals that, in September 2010, C.C. chased the children through the home with a knife and sought to attack Y.B. After a forcible arrest, the court issued a no contact order, and Y.B. admitted she was aware of that order. Nonetheless, the record shows that she allowed C.C. into the home, as

9

evidenced by his answering the home phone when the prosecutor called, and by the children's statements acknowledging he was living in the home.

C.C.'s presence in the home placed the children at risk, particularly due to his history of domestic violence with Y.B. and the children. Nonetheless, Y.B. ignored this risk and allowed him to return to the home, despite her awareness of the no contact order. Thus, the record provides a solid basis for the court's determination under Title 9, and we decline to set it aside.

II.

We turn next to defendants' appeals from the judgment of guardianship. We will not recite in detail the history of the Division's involvement with defendants from April 2011, when it took custody of Jenna, until the March 14, 2018 judgment. Instead, we incorporate by reference the factual findings and legal conclusions contained in Judge Lois Lipton's thorough and thoughtful oral decision rendered on that date. We add the following comments.

After C.C. violated the no contact order with Y.B.'s permission, the Division placed Jenna and one of her siblings in a resource home after defendants were unable to identify any relatives qualified to care for the child. Y.B. was granted supervised parenting time with Jenna, but she missed many of

10

the scheduled visits. Y.B. also tested positive for benzodiazepines in September and October 2011.

In November 2011, Y.B. stabbed C.C. when she learned he was having an extramarital affair, and C.C. responded by hitting Y.B. in the face with a vase and attacking her with a screwdriver. C.C. was charged with aggravated assault, and later sentenced to State prison, where he remained until January 2016. While C.C. was incarcerated, the Division arranged for Jenna to visit C.C. at the institution.

During this period, the Division continued to provide services to Y.B. The court ordered a reunification of Y.B. and all four of her children in March 2013, but she continued to abuse drugs, and was eventually jailed for nine months on outstanding assault and robbery warrants. The Division again obtained custody of Jenna in September 2014.

In September 2015, the Division placed Jenna and her sibling with a maternal aunt, N.G. (Nancy). Jenna has lived with Nancy since that time and now views her aunt as her primary parental figure. Nancy wishes to adopt Jenna.

After Y.B. and C.C. were released from jail in 2016, the Division again attempted to work with them. However, Y.B. continued to engage in substance abuse, and exhibited increasingly erratic behavior due to her mental illness.

C.C. fared somewhat better, but soon began to avoid mandatory urine testing. In September 2016, he was admitted to the hospital for seizures and convulsions arising from excessive alcohol consumption, and was diagnosed with alcohol withdrawal seizure and delirium tremens. He continued to abuse alcohol even though doing so was in violation of the conditions of his parole.

Y.B. and C.C. did not testify at trial. The Division's expert psychologist, Dr. Karen Wells evaluated both defendants. Dr. Wells concluded that placing Jenna with Y.B. would expose the child to harm due to Y.B.'s refusal to complete substance abuse treatment and mental health treatment. Similarly, Dr. Wells found that C.C. had not displayed the stability needed to provide a safe home for Jenna and would not be able to do so in the foreseeable future.

Dr. Wells conducted a bonding evaluation between Jenna and C.C. and between Jenna and Nancy. Dr. Wells found that although C.C. and Jenna had a bond, any harm from severing it would not be severe or enduring, and Nancy would be able to mitigate that harm. On the other hand, Jenna viewed Nancy as her primary parental figure and, as a result, Dr. Wells opined that breaking their bond would severely harm the child. Judge Lipton found Dr. Wells's testimony to be credible and persuasive.

Two psychologists testified on C.C.'s behalf. Dr. Andrew Brown found that although Jenna was "very comfortable" with Nancy, she was "more animated" during her time with C.C. However, he acknowledged that Jenna saw Nancy as her psychological parent. Although Dr. Brown opined that C.C. could provide Jenna with stability, safety, and security, he admitted on cross-examination that he had not reviewed any of C.C.'s treatment records for the seizures he experienced due to his excessive consumption of alcohol. Therefore, Judge Lipton found Dr. Brown's testimony to be less credible than that of Dr. Wells.

Judge Lipton reached a similar conclusion concerning the weight to be given to C.C.'s other expert, Dr. Barry Katz. Like Dr. Brown, Dr. Katz testified that Jenna showed an "increased level of enthusiasm" when seeing C.C., and he opined that if C.C. was ever able to achieve one year of sobriety, and complied with services during that period, he could safely parent the child. However, Judge Lipton rejected the expert's conclusion that Jenna could be placed in C.C.'s care because Dr. Katz acknowledged that he had failed to consider various facts, including the negative inference arising from C.C.'s missed urine tests, his lack of compliance with urine tests, and the amount of time Jenna had already been waiting for permanency.

A-2427-16T2

In her extensive oral opinion, Judge Lipton reviewed the evidence presented at the multi-day trial, and concluded that (1) the Division had proven all four prongs of the best interests test by clear and convincing evidence, N.J.S.A. 30:4C-15.1(a); and (2) termination of defendants' parental rights was in the child's best interests. In this appeal, our review of the trial judge's decision is limited. We defer to her expertise as a Family Part judge, Cesare, 154 N.J. at 413, and we are bound by her factual findings so long as they are supported by sufficient credible evidence. M.M., 189 N.J. at 279 (citing In re Guardianship of J.T., 269 N.J. Super. 172, 188 (App. Div. 1993)).

After reviewing the record, we conclude that Judge Lipton's factual findings are fully supported by the record and, in light of those facts, her legal conclusions are unassailable. We therefore affirm substantially for the reasons that the judge expressed in her comprehensive opinion.

In so ruling, we reject defendants' contentions that they should have been given more time to demonstrate that they could safely parent Jenna at some undefined point in the future. Children are entitled to a permanent, safe and secure home. We acknowledge "the need for permanency of placements by placing limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Family Servs. v. C.S., 367

N.J. Super. 76, 111 (App. Div. 2004). As public policy increasingly focuses on a child's need for permanency, "[t]he emphasis has shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." Ibid. (citing N.J.S.A. 30:4C-11.1). That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe and stable placement." Ibid.

The question then is whether the parent can become fit in time to meet the needs of the children. N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 512 (2004) (indicating that even if a parent is trying to change, a child cannot wait indefinitely). After carefully considering the record, Judge Lipton reasonably determined that neither defendant was able to parent Jenna, and would not be able to do so for the foreseeable future. Under those circumstances, we agree with the judge that any further delay of permanent placement would not be in the child's best interests.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2427-16T2